**TYONEK NATIVE CORPORATION,
and Cook Inlet Region, Inc.,
Plaintiffs,**

**v.**

**SECRETARY OF the INTERIOR OF the UNITED STATES of America and Alaska Native Claims Appeal Board, Defendants.**

**and**

**State of Alaska, Intervenor Defendant.**

**No. A77–207 Civ.**

United States District Court,
D. Alaska.

Feb. 28, 1986.

Russ Winner, McGrath & Associates, Anchorage, Alaska, for plaintiffs.

Land and Natural Resources Div., Dept. of Justice, Bruce M. Landon, Anchorage, Alaska, for defendants.

Elizabeth J. Barry, Asst. Atty. Gen., Anchorage, Alaska, for intervenor-defendant.

## OPINION AND ORDER

BREWSTER, District Judge.[*]

On these cross-motions for partial summary judgment, the issue is whether native village corporations created under the Alaska Native Claims Settlement Act (hereafter ANCSA), 43 U.S.C. sections 1601–1629a, are entitled to select for ownership lands that the State of Alaska had previously selected under the authority of the Mental Health Enabling Act, Pub.L. No. 830, 70 Stat. 709 (1956), but which, although "tentatively approved", have not yet been patented to the state. The court holds that Congress did not intend such lands to be available for selection by native village corporations and accordingly grant partial summary judgment in favor of defendants.

## I. BACKGROUND

A chronological outline of the relevant events is necessary to understand the issue before the Court. On July 28, 1956, Congress enacted the Mental Health Enabling

---

[*] The Honorable Rudi M. Brewster, District Judge, Southern District of California, sitting by designation.

Act (hereafter MHEA). Section 202 of the MHEA granted to the Territory of Alaska the right to select within ten years one million acres of federal land to be administered as a public trust to finance treatment of the mentally ill in Alaska.

On July 7, 1958, Congress enacted the Alaska Statehood Act, Pub.L. 85–508, 72 Stat. 339 (1958). Sections 6(a) and 6(b) of that Act made land grants to the new state of 800,000 and 102,550,000 acres respectively. The state's selections were to be made within 25 years after Alaska's admission into the United States. Section 6(k) provided that "[g]rants previously made to the Territory of Alaska are hereby confirmed and transferred to the State of Alaska."

On August 29, 1960, the state filed an application with the Federal Bureau of Land Management (hereafter BLM) for approximately 10,000 acres of land, which includes the land at issue here. The letter to the BLM stated that the selection was made "[u]nder the provisions of the Act of July 28, 1956, as supplemented." *See* Ex. A to Plaintiffs' Supplemental Reply Brief. In the early 1960's, the BLM "tentatively approved" the state's selection. These lands have not yet been patented to the state. The state's right to select lands under MHEA expired on July 28, 1966.

Congress enacted ANCSA on December 18, 1971. Plaintiff Tyonek Native Corporation (hereafter Tyonek) is a native village corporation formed pursuant to section 8 of ANCSA, and Plaintiff Cook Inlet Region, Inc. (hereafter CIRI) is a Native regional corporation formed pursuant to section 7.

Section 12(a) of ANCSA authorizes Native village corporations to select within three years a prescribed acreage of lands in the vicinity of their villages.[1] Those selections must be made from lands "withdrawn" by section 11(a), 43 U.S.C. § 1610(a), which provides in relevant part:

*Sec. 11(a)(1).* The following *public lands* are withdrawn, subject to valid existing rights, from all forms of appropriation under the public land laws ... and from selection under the *Alaska Statehood Act,* as amended:

(A) The lands in each township that encloses all or part of any Native village identified pursuant to subsection (b);

(B) The lands in each township that is contiguous to or corners on the township that encloses all or part of such Native village; and

(C) The lands in each township that is contiguous to or corners on a township containing lands withdrawn by paragraph (B) of this subsection.

(2) All lands located within the townships described in subsection (a)(1) hereof that have been selected by or tentatively approved to, but not yet patented to, the State under the *Alaska Statehood Act* are withdrawn, subject to valid existing rights, from all forms of appropriation under the public lands laws.... (emphasis added)

The "public lands" referred to in section 11(a)(1) are defined in section 3(e), 43 U.S.C. § 1602(e), as:

all Federal lands and interests therein located in Alaska *except* (1) the smallest practicable tract, as determined by the Secretary, enclosing land actually used in connection with the administration of any Federal installations, and (2) land selections of the State of Alaska which have been patented or tentatively approved under section 6(g) of the Alaska Statehood Act, as amended ..., *or identified for selection by the state prior to January 17, 1969.* (emphasis added)

On December 17, 1974, pursuant to section 12(a), Tyonek filed with the BLM an application for approximately 9800 acres of

---

1. Section 12(a), 43 U.S.C. § 1611(a), provides in relevant part:

During a period of three years from the date of enactment of this Act, the Village Corporation for each Native village identified pursuant to section 11 shall select, in accordance with rules established by the Secretary, all of the township or townships in which any part of the village is located, plus an area that will make the total selection equal to the acreage to which the village is entitled under section 14. The selection shall be made from lands withdrawn by subsection 11(a)....

land. It is undisputed that all 9800 acres fall within Tyonek Native village's so-called core and ring township areas described in section 11(a)(1)(A)–(C). These 9800 acres comprise the bulk of the 10,000-acre August 29, 1960 land selection made by the state under the MHEA.

Another Native village corporation, Seldovia Native Association, Inc. also selected mental health lands that had yet to be patented to the state. The BLM rejected Seldovia's application and Seldovia appealed. The Secretary of the Department of the Interior, acting through defendant Alaska Native Claims Appeals Board (ANCAB), affirmed BLM's decision in *In re Appeal of Seldovia Native Association, Inc.*, ANCAB VLS 75–3 (July 1, 1976).

ANCAB rejected Seldovia's arguments that the mental health lands were withdrawn for selection by Native village corporations by section 11(a). First, ANCAB determined that the mental health lands were not "public lands" withdrawn under 11(a)(1) since they were not federal lands or interests therein as required by section 3(e). Second, ANCAB found that the mental health lands were not "lands selected by or tentatively approved to the State under the Alaska Statehood Act" and thus were not withdrawn by section 11(a)(2).

On August 4, 1976, BLM rejected Tyonek's 9800 acre application in its entirety, relying on ANCAB's *Seldovia* decision. Tyonek appealed and, on November 29, 1976, all of the parties to Tyonek's appeal stipulated that the dispositive issues in that case were identical to the dispositive issues in *Seldovia*. Accordingly, on January 10, 1977, ANCAB entered a final order in Tyonek's appeal adopting the conclusions in *Seldovia*. Tyonek and CIRI[2] appeal this final order of ANCAB.

The parties have cross-moved for partial summary judgment on the statutory interpretation issues involved in the case.

## II. STANDARD OF REVIEW

 Agency interpretations of statutes they administer are generally entitled to deference. *See, e.g., Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *State of Washington v. United States Environmental Protection Agency*, 752 F.2d 1465, 1469 (9th Cir.1985); *Doyon, Ltd. v. Bristol Bay Native Corp.*, 569 F.2d 491, 497 (9th Cir.), *cert. denied*, 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1978) (Secretary of Interior's interpretation of ANCSA found entitled to "great weight"). However, the amount of deference to the agency interpretation is influenced by a number of factors, one of which is the principle that legislation passed for the benefit of Natives should be liberally construed in their favor. *See, e.g. Choate v. Trapp*, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912); *Alaska Public Easement Defense Fund v. Andrus*, 435 F.Supp. 664, 671 (D.Alaska 1977) (*hereafter APEDF*). The court in *APEDF* stated that its approach was to resolve any ambiguities remaining after examining the statutory language and legislative history of the ANCSA provision at issue in favor of the Natives. *APEDF*, 435 F.Supp. at 671.

Balancing these countervailing principles regarding the standard of review, however, does not affect the disposition of these motions. This court's agreement with ANCAB's determination is based on a *de novo* review of the statutory language and legislative history as applied to the undisputed facts of this case.

## III. ANALYSIS

### A. *Introduction*

 No provision in ANCSA explicitly states that lands selected by, but not yet patented, to the state pursuant to the MHEA are eligible for Native selection. Plaintiffs advance two arguments for their position that Congress intended to make mental health lands available for Native

---

**2.** CIRI's interest in this litigation arises from section 14(f), 43 U.S.C. § 1613(f), which, in general, grants to the regional corporation in which the lands are located the patent to the subsurface estates of any lands patented to a village corporation under ANCSA.

selection. Their principal contention is that Congress intended section 11(a)(2)'s withdrawal of lands that "have been selected by, or tentatively approved to, but not yet patented to, the State under the Alaska Statehood Act" to include mental health lands. Plaintiffs urge that mental health selections became selections "under the Alaska Statehood Act" by virtue of section 6(k) of that Act, which provides: "Grants previously made to the Territory of Alaska are hereby confirmed and transferred to the State of Alaska upon its admission." In the alternative, plaintiffs argue that the mental health lands satisfy section 3(e)'s definition of "public lands" and that the mental health lands are thus withdrawn under section 11(a)(1).

Plaintiffs' arguments confront an immediate obstacle. To adopt their interpretation, the court must find that Congress intended to permit possible divestiture from the state of a portion of the 1,000,000 acres granted to it in the MHEA. At the time of the passage of ANCSA in December 1971, the state had received patent to about 785,000 acres of its mental health selections and thus was awaiting the patent of about 215,000 additional acres. *See* Ex. 1 to Memorandum in Support of State's Motion for Summary Judgment. As noted above, the period for making mental health selections had expired in 1966. Consequently, if in ANCSA Congress allowed Native village corporations to select unpatented mental health selections, the state would be prevented from making up any resulting shortfall in its 1,000,000 acre entitlement.

In contrast, Congress's explicit authorization in section 11(a)(2) of Native selection of unpatented Statehood Act selections did not require the state to relinquish any of the 103,350,000 acres granted by the Statehood Act. The state's 25 years for making Statehood Act selections did not expire until 1984, ten years after the 1974 termination of the ANCSA section 11(a)(2) three-year selection period. *See* ANCSA, § 12(a)(1), 43 U.S.C. § 1611(a)(1). Thus, the state had ample time under the State-

hood Act to replace any lands selected by Native villages with new selections.

The plaintiffs assert that Congress can be presumed to have understood that the state had overselected its MHEA entitlement by about 110,000 acres. This speculation is unsupported. The plaintiffs rely on a July 18, 1974 BLM memorandum, but concede that when ANCSA was enacted in 1971 BLM did not keep records on the status of MHEA selections. There is no documentation to support and little reason to believe that Congress was aware of the status of the state's MHEA selections when it enacted ANCSA. Plaintiffs are unable to point out any legislative history to this effect. A more contemporaneous document, prepared by the state for the week ending December 24, 1971, shows that the state had only applied for about 37,000 acres in excess of its total MHEA entitlement. *See* Ex. 1 to State's Memorandum in Support of Motion for Summary Judgment. Again, there is no indication Congress was aware of this document, but, even if it were, it appears that far more than 37,000 acres of unpatented MHEA selections would be vulnerable to Native selection under plaintiff's interpretation of ANCSA. Plaintiffs do not dispute the affidavit submitted by the federal defendants averring that at least 100,000 acres of the unpatented MHEA selections fall within the core and ring township acres surrounding Native villages identified for potential Native selection in section 11(a)(1). *See* Ex. 3 to Federal Defendants' Cross-Motion for Summary Judgment.

The court concludes that, to accept plaintiffs' interpretation of ANCSA, the court must find that Congress intended the state potentially to forfeit a significant portion of its 1,000,000 acre MHEA grant. Since there is no explicit ANCSA provision that mental health lands are eligible for Native selection, plaintiffs must bear the burden of demonstrating that Congress intended by implication to repeal a portion of its prior land grant to the Territory and State of Alaska. This they have not done.

## B. *Section 11(a)(2)*

ANCAB found that the mental health lands at issue were not "selected by, or tentatively approved to, but not yet patented to, the State under the Alaska Statehood Act," notwithstanding the fact that section 6(k) of the Statehood Act "confirmed and transferred" to the state grants previously made to the Territory. The court agrees with ANCAB's determination that these selections cannot be said to be made "under the Statehood Act."

Most important, by its terms, section 6(k) merely confirms and transfers Territorial grants to the state upon its admission. It does not purport to transform the MHEA land grant into a grant under the Statehood Act. It only vests the state with the authority to execute the powers and responsibilities conferred to the Territory by the MHEA.

Plaintiffs' interpretation would render superfluous the words "under the Alaska Statehood Act" in section 11(a)(2). If Congress had intended to make all unpatented state lands available for Native selection, there would have been no need for the reference to the Statehood Act. Plaintiffs' contention that Congress added the phrase to exclude from the operation of section 11(a)(2) lands conveyed to the state from third parties is specious. Congress would have no reason to exclude from the section 11(a)(2) withdrawal any lands that the state had received from sources other than the federal government because Congress would have no power to deal with those lands. The interpretation of section 11(a)(2) that gives meaning to all the words used by Congress—that only unpatented Statehood Act selections are withdrawn—must be favored. *See e.g., Reiter v.*

*Sonnetone Corp.,* 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979); 2A Sands, *Sutherland Statutory Construction* § 46.06 (4th ed. 1984).

Plaintiffs find it significant that the BLM and the state sometimes referred to "tentative approvals" of state mental health selections, even though the MHEA does not require tentative approval. Plaintiffs argue that, since the Statehood Act does require tentative approvals of selections under that Act, this administrative practice is evidence of a recognition by the BLM and the state that the mental health lands were selected under the Statehood Act. This contention is unconvincing. It is more likely that Congress was more familiar with the statutory language of the MHEA and the Statehood Act than it was of the administrative practices of the BLM and the state. Thus, the fact that the Statehood Act requires the tentative approval of land selections, and the MHEA does not,[3] only buttresses the defendants' interpretation that section 11(a)(2)'s withdrawal of unpatented lands that have been "tentatively approved to" the state under the Statehood Act does not include mental health lands.

As secondary arguments, both sides contend that regulations promulgated by the Department of the Interior after the enactment of the Statehood Act support their interpretation of section 11(a)(2). The court concludes that, on balance, the regulations cited by both sides provide further support for the defendants' view. The most significant regulation is 43 C.F.R. § 76.9(a)(1) (1963), promulgated in 1959,[4] which required all state mental health selection applications to contain "a reference to the Act of July 28, 1956 [the MHEA] ..., as supplemented."[5] Thus, construing

---

**3.** Section 6(g) of the Statehood Act provides in relevant part:

> Following the selection of lands by the State and the tentative approval of such selection by the Secretary of the Interior or his designee, but prior to the issuance of final patent, the State is hereby authorized to execute conditional leases....

Section 202(d) of the MHEA contains an almost identical provision except that there is no tentative approval requirement:

> (d) Following the selection of lands by the Territory pursuant to subsection (b), but prior to the issuance of final patent, the Territory shall be authorized to lease....

**4.** 24 Fed.Reg. 4657 (1959).

**5.** The State's August 29, 1960 application for the parcel containing the lands at issue here contained this reference.

the Statehood Act shortly after its enactment, the Secretary of Interior did not treat mental health selections as selections under the Statehood Act. This contemporaneous construction of the effect of the Statehood Act on the MHEA is entitled to great weight. *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

### C. *Section 11(a)(1)*

Plaintiffs' argument that the unpatented mental health selections are "public lands" withdrawn by section 11(a)(1) focuses attention on section 3(e)'s definition of "public lands". ANCAB concluded that the definition was not satisfied because the mental health lands are not "Federal lands" or "interests therein." The court agrees with ANCAB's conclusion that the mental health lands at dispute are not "public lands," but for a different reason. The unpatented mental health lands fall within the second exception to the definition of public lands set forth in section 3(e)(2).[6]

Section 3(e)(2) excepts from "public lands":

> (2) land selections of the State of Alaska which have been patented or tentatively approved under section 6(g) of the Alaska Statehood Act, ... *or identified for selection by the State prior to January 17, 1969* (emphasis added).

Significantly, the underlined phrase is not qualified by a reference to the Statehood Act, in contrast to the preceding phrase. If Congress wanted to limit the effect of this second exception to section 3(e)(2), it easily could have added "under the Statehood Act" after the words "identified for selection." Thus, all state selections prior to January 17, 1969, including the mental health selections at issue here, are expressly excluded from the definition of "public lands."

A contrary interpretation of section 3(e) would mean mental health lands are withdrawn by section 11(a)(1) and would lead to

results that Congress probably did not intend. Section 12(a)(1) provides that no village corporation may select more than 69,120 acres from lands withdrawn by section 11(a)(2). There is no such limit on the acreage that village corporations may select from public lands under section 11(a)(1), except for federal lands within the National Wildlife Refuge System or in a National Forest. In addition, section 22(h)(2) provides that the withdrawal of lands made by section 11(a)(2) terminates within three years. In contrast, the withdrawal under section 11(a)(1) lasts for four years. ANCSA § 22(h)(1). It is doubtful that Congress intended mental health selections to be available for Native selection without the protection of the section 12(a)(1) acreage limitation that applies to selections of unpatented Statehood Act lands under section 11(a)(2). It is also highly unlikely that Congress would establish a longer withdrawal period for unpatented mental health lands than unpatented Statehood Act selections.

These other provisions of ANCSA make it apparent that Congress purposefully made two independent withdrawals in sections 11(a)(1) and 11(a)(2), instead of one integrated withdrawal of lands within the core and ring township areas. Congress intended to deal with federal lands in section 11(a)(1) and with lands in which the State had an interest in section 11(a)(2). If Congress intended to withdraw unpatented mental health lands, it would have done so in section 11(a)(2).

Plaintiffs contend that Congress was not referring to unpatented mental health selections when it excepted lands "identified for selection by the State prior to January 17, 1969" from the definition of public lands. They argue that this phrase is aimed only at massive state selections under the Statehood Act made just prior to a "land freeze" ordered by the Secretary of the Interior, which became effective January 17, 1969. The court cannot accept this

---

6. Thus, the court does not reach the question of whether the unpatented mental health selections constitute "Federal lands" or "interests therein."

argument. While the effective date of the land freeze undoubtedly is responsible for the use of that date in section 3(e)(2), this is no reason to conclude that Congress intended the exception to apply only to Statehood Act selections. The period for making mental health selections ended in 1966. As noted above, if Congress wanted to limit the exclusion to Statehood Act selections, it could have added this limitation. Plaintiffs have not cited any persuasive legislative history supporting their view of section 3(e)(2).

### D. *Legislative History*

The legislative history of ANCSA provides some support for both sides. On balance, however, it provides no conclusive evidence indicating that Congress implicitly intended tentatively approved but as yet unpatented mental health lands to be available for Native selection. In fact, the court finds it to be more supportive of defendants' position.

The most significant feature of the legislative history is that it contains virtually no clear reference to the one million acre MHEA land grant. This fact alone strongly suggests that Congress either was under the misconception that all the state's MHEA selections had been patented to the state already or was unaware that such a land grant existed. It seriously undermines the view that Congress implicitly intended a partial repeal of the MHEA grant.

Before delving deeper into the legislative history, a brief summary of the process that yielded the final ANCSA legislation is in order. Bills addressing Alaskan Native claims were first introduced in 1967. ANCSA was ultimately the product of a House-Senate Conference Committee resolution of H.R. 10367, the bill passed by the House, and S. 35, passed by the Senate. H.R. 10367 was introduced by Representative Aspinall on August 4, 1971. It provided that Native village corporations could select a limited amount of lands tentatively approved to the state "under the Alaska Statehood Act" within 25 townships of a Native village. S. 35, however, did not allow Natives to select land previously tentatively approved to the state. The Conference Committee basically adopted the House bill's approach on this issue. *See* Conf.Rep. No. 746, 92d Cong., 1st Sess. 43, *reprinted in* 1971 U.S.Code Cong. & Ad. News 2192, 2247, 2256.

The strongest support for plaintiffs' interpretation comes from acreage figures cited by key legislators when discussing the number of acres granted the state under the Statehood Act. The figures appear to include the one million acre MHEA grant. One such acreage reference was made by Representative Haley [7] at the time the House was considering enactment of H.R. 10367:

> Under the Alaska Statehood Act the state is entitled to select and get patent to about 104½ million acres of land.

> . . . . .

> The state will participate in the land part of the settlement by allowing the Natives to get some of the land near their villages which the state has already selected under the Statehood Act.

117 Cong.Rec. 36857 (1971). The plaintiffs infer that Representative Haley must have believed mental health lands were granted "under the Statehood Act," as that term is used in section 11(a)(2), since he could not have arrived at the 104½ million acre figure without including the one million acre MHEA entitlement.[8]

In addition, House Conference Report No. 746, 92d Cong., 1st Sess. 39, *reprinted in* 1971 U.S.Code Cong. & Ad.News 2247, 2252, stated:

> State selections made before the date of the Secretarial Order imposing a "land freeze", amounting to about 26 million

---

7. Rep. Haley was Chairman of the House Subcommittee on Indian Affairs of the Committee on Interior and Insular Affairs, which favorably reported out H.R. 10367.

8. As noted above, sections 6(a) and 6(b) of the Statehood Act granted 103,550,000 acres to the state.

acres, are protected against Native selection, except that a Native village (not the Regional Corporations) may select from the area surrounding the Village not to exceed three townships of the lands previously selected by the state.

Plaintiffs note that the land freeze referred to in the Conference Report went into effect on January 17, 1969 and that, according to a document prepared by Alaska's Department of National Resources for activity ended January 24, 1969, the state had applied for 26,018,873.47 acres under all land entitlement programs including the MHEA.[9] Plaintiffs infer from the Conference Report that Congress intended state MHEA, as well as Statehood Act, selections to be eligible for limited selection by Native village corporations.

Closer examination of the legislative history suggests, however, that it would be wrong to assume that the legislators were that precise in their use of numbers. A more complete look at Representative Haley's comments suggests that he did not intend to include the MHEA land grant when he spoke of the state's entitlement to 104½ million acres under the Statehood Act. His next sentence was: "This is a large amount, and it was granted by Congress because the State needed that land as a capital asset to use in developing the State's economy." 117 Cong.Rec. 36857 (1971). This description does not fit the MHEA land grant. As noted above, the purpose of that grant was the raising of revenues to finance mental health care for Alaska residents.

Furthermore, while the use of the 26,000,000 acre figure in the House Conference Report suggests an intent to make all those acres available for limited selection by Native village corporations, this plainly was not Congress's desire. The 26,000,000 acres included lands that had already been patented to the state under the Statehood Act, the MHEA and other land grant programs.[10] It is undisputed that Congress did not intend to divest the state of patented lands in favor of Natives. Since there is no evidence that the acreage figures cited by plaintiffs were precisely accounted for, and in fact the evidence is to the contrary, those figures cannot afford a basis for adopting plaintiffs' interpretation.

In a post-hearing submission, plaintiffs argue that statements made by Senators Stevens and Jackson on the Senate floor immediately prior to the passage of the Alaska National Interest Lands Conservation Act (ANILCA), Pub.L. No. 96–487, 94 Stat. 2371 (1980), demonstrate that the unpatented MHEA selections were selected "under the Alaska Statehood Act":

> Mr. STEVENS. There has been some question raised as to whether the lands conveyed to the State of Alaska under the university, school land and mental health grants are State lands under the definition of the Statehood Act and this act. I would like to clarify that these lands are State lands and are subject to the same protection and status of any lands conveyed under the Alaska Statehood Act.
>
> Mr. JACKSON. The Senator is correct. We clearly intended at the passage of the Alaska Statehood Act that such lands conveyed to the State of Alaska or its political subdivisions, including the University of Alaska, would be considered State lands for purposes of Federal law.

9. The document shows that the state had made land selections as follows:

| State Selection | 24,660,394.75 |
|---|---|
| Mental Health | 1,037,215.15 |
| School Lands | 107,235.54 |
| University Grant | 99,303.32 |
| Other Grants | 114,724.71 |
| Total | 26,018,873.47 |

10. Of the 26,018,873.47 acres the state had selected by January 24, 1969, 5,594,885.91 acres had already been patented to the state in the following categories:

| State Selection | 4,644,927.78 |
|---|---|
| Mental Health | 734,215.75 |
| School Lands | 100,202.26 |
| University Grant | 99,414.57 |
| Other Grants | 16,125.55 |
| Total | 5,594,885.91 |

This bill reaffirms that status of these lands.

126 Cong.Rec. 21884 (1980). Just prior to this exchange, Senator Stevens stated:

It is my understanding that nothing in this title is intended to affect in any way pending litigation regarding the selectability under ANCSA of any particular tract of land including lands previously reserved to or selected by the Territory or State of Alaska under any provisions of Federal law.

MR. JACKSON. The Senator is correct. We do not intend to affect pending litigation on such questions by the passage of title IX of this bill.

*Id.*

The plaintiffs' reading of these comments—that Senator Stevens was clarifying that the mental health lands should be treated as lands conveyed under the Statehood Act for purposes of ANCSA—is plausible. However, it is at least as plausible that the senators were merely clarifying that university, school land, and mental health grants—land grants made to the Territory of Alaska—should be treated as state land as opposed to federal land. It is far from clear that the senators are addressing the meaning of the phrase "under the Statehood Act" in ANCSA section 11(a)(2). In fact, their assurances that Title IX of ANILCA is not intended to affect pending litigation regarding the selectability of lands under ANCSA suggests the opposite. It is unlikely that the senators would be careful to clarify that Title IX of ANILCA, a well-scrutinized piece of legislation, was not meant to affect pending litigation and then attempt to resolve the issue in this litigation in a few sentences spoken on the Senate floor. In sum, this subsequent legislative history is too ambiguous to conclude that Congress intended in section 11(a)(2) to treat MHEA selections as selections under the Statehood Act.[11]

## IV. CONCLUSION

Neither the statutory language nor the legislative history of ANCSA manifest Congressional intent to repeal a portion of the one million acre MHEA land grant and make unpatented MHEA lands available for Native selection. Accordingly, the plaintiffs' motion for partial summary judgment is denied and the defendants' cross motion for partial summary judgment is granted.

## V. ENTRY OF JUDGMENT UNDER RULE 54(b)

█ This decision rejects the ANCSA interpretation claim raised in counts one through four and count seven of the amended complaint filed August 31, 1982. These summary judgment motions do not involve the remaining three counts of the amended complaint. Pursuant to Fed.R. Civ.Proc. 54(b) the court finds that there is no just reason for delaying the entry of judgment as to the ANCSA interpretation claim, following the standard enunciated in *Morrison-Knudsen Co. v. Archer*, 655 F.2d 962 (9th Cir.1981).

Specifically, the court finds that the unresolved claims for relief are factually and legally distinct from the ANCSA interpretation claim. Counts five and six allege that the state selections at issue in this case are invalid because the state has overselected its one million acre MHEA entitlement and that these land selections are of lower priority than the selections necessary to reach the one million acre limit. Count eight alleges that the state has forfeited its rights to the lands at issue, because it has breached its MHEA trust obligation by treating the MHEA selections the same as Alaska Statehood Act section 6(b) lands. Resolution of these claims will require a

---

**11.** None of plaintiffs' other ANCSA legislative history arguments come close to demonstrating that Congress intended mental health lands to be available for Native selection. For example, plaintiffs highlight the fact that none of the State of Alaska maps used by Congress distinguished between Statehood Act and MHEA selections; instead they treated as one category lands tentatively approved to the state. This fact, however, only confirms the likelihood that Congress either believed all the state's MHEA selections had been patented already or was unaware of the existence of the MHEA.

wholly different factual and legal analysis from the statutory interpretation issue presented by these summary judgment motions.

The court further finds that final resolution of this ANCSA interpretation question will have a significant impact on other similar pending claims to unpatented MHEA lands by other native corporations. In addition, should the court of appeals disagree with this court's determination, the plaintiffs undoubtedly would not pursue their remaining claims. Based on the foregoing, the court concludes that the ANCSA interpretation issue is pivotal to this case and other pending cases, and its resolution should not be delayed. Pursuant to Rule 54(b), the clerk is directed to enter judgment for the defendants on the statutory interpretation issue decided herein. The time for appeal of this decision will begin with the entry of this opinion and order.

### ORDER

Based on the foregoing opinion, it is hereby ordered that:

(1) Defendants' motion for partial summary judgment is GRANTED.

(2) Plaintiffs' motion for partial summary judgment is DENIED.

(3) The Clerk shall enter judgment, pursuant to Fed.R.Civ.Proc. 54(b), for the defendants on the statutory interpretation claim raised in counts one through four and count seven of the amended complaint filed August 31, 1982.