806 F.2d 924
 ALEKNAGIK NATIVES LIMITED; Aleknagik City Council; and
Aleknagik Village Council, Plaintiffs-Appellants,
v.
UNITED STATES of America; Donald P. Hodel, Secretary of the
Interior; Gail Ozmina, Townsite Trustee, et al.,
Defendants-Appellees,
and
English Bay Village Council and Port Graham Village Council,
Intervening Defendants-Appellees.
 No. 85-4116.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 4, 1986.
Decided Dec. 19, 1986.
 
 James Vollintine, Vollintine, Taylor & Carey, Anchorage, Alaska, for plaintiffs-appellants.
 Deborah Smith, Asst. U.S. Atty., Monte Engel, Alaska Legal Services Corp., Anchorage, Alaska, for defendants-appellees.
 Appeal from the United States District Court for the District of Alaska.
 Before SNEED, KENNEDY, and WIGGINS, Circuit Judges.
 KENNEDY, Circuit Judge:
 
 
 1
 The native Alaskan village corporation Aleknagik and its city and village council brought suit in the district court against the Secretary of the Interior and various individual defendants. The village councils of Port Graham and English Bay intervened as defendants. The district court granted summary judgment for the defendants, and we consider the appeal by the nonprevailing parties. We affirm.
 
 
 2
 The case turns on the interpretation of statutes relating to the creation and operation of federal townsite laws in Alaska. In 1891 and 1926, Congress extended the operation of federal townsite laws to Alaska. 43 U.S.C. Sec. 732 (repealed 1976); Alaska Native Townsite Act of 1926, 43 U.S.C. Secs. 733-36 (repealed 1976) (ANTA). To bring about formation of a townsite, its occupants were required by ANTA to apply to the Bureau of Land Management for a survey of the proposed exterior boundaries. After the survey, and upon a petition by a majority of the occupants to the Secretary, the townsite's interior was surveyed to be divided into lots and blocks. The petition also would include a request for the appointment of a townsite trustee. This process had the effect of segregating the land from further disposal under public land laws.
 
 
 3
 After segregation, the occupied areas of the townsite were subdivided by the United States into blocks, lots, streets, alleys, and municipal public reservations. Lots owned by nonnatives paid an assessment for the survey. 43 C.F.R. Secs. 2565.3(a), (b) (1970). Other areas of the townsite remained unsubdivided until occupied. Following subdivision, the Secretary issued patents for the land, allowing the trustee to issue deeds to occupants after payment of any purchase price or assessments. The date of the subdivision survey was the last day for new claims within the subdivision. 43 C.F.R. Sec. 2565.3(c) (1970). Once the subdivision survey was complete, all unclaimed lots could be sold by the trustee at a public sale. 43 C.F.R. Sec. 2565.5 (1970). Proceeds of sales went to the municipality. All unsold lots were deeded to the municipality, a provision which is of central importance in this case. 43 C.F.R. Sec. 2565.7 (1970). After all lands within the townsite trust were progressively subdivided and distributed, the townsite trust terminated. Thus, the distribution process had two major steps. The first step was the segregation, which set aside the townsite. The second step was subdivision, which led to distribution and conveyances of the land.
 
 
 4
 In 1971 Congress enacted the Alaska Native Claims Settlement Act. 43 U.S.C. Secs. 1601-28 (1982) (ANCSA). ANCSA authorized the conveyance of some 44 million acres to Alaskan native corporations. One of ANCSA's key provisions withdrew public lands surrounding native villages from all public appropriations, except for lands "subject to valid existing rights." 43 U.S.C. Sec. 1610(a)(1) (1982).
 
 
 5
 In administering ANCSA, the Secretary was required to determine whether townsite land that had been segregated, but not yet subdivided and distributed, was within this exception for "valid existing rights." In 1972 the Director of the Bureau of Land Management issued a memorandum concluding that if the occupants had filed their petition to segregate, i.e. if the occupants had begun the first step of the process, before ANCSA's enactment, the land came within the existing rights exception. Shortly after issuance, the Acting Secretary of the Interior approved the memorandum. Although the memorandum was not published, its contents were made known to native corporations.
 
 
 6
 In 1976 Congress repealed ANTA. Federal Land Policy and Management Act of 1976, Pub.L. No. 94-579, Sec. 703(a), 90 Stat. 2743, 2789-90 (1976). There remains, however, the question whether the Secretary properly allowed distribution of land within townsites between 1971 and 1976. Additionally, the intervenor defendants argued before the district court that the legislation repealing ANTA had been incorrectly interpreted to foreclose new entries, post-1976, on townsite lands under townsite laws, but this argument has not been pursued on appeal. The major issue for our resolution is whether the Secretary's interpretation of the existing rights exception contained in 43 U.S.C. Sec. 1610(a)(1) should stand.
 
 
 7
 In an earlier phase of this case, on appeal from the district court's denial of a preliminary injunction, we concluded that preliminary injunctive relief should be granted to the extent necessary to prohibit the Secretary from granting deeds, so that the status quo would be maintained pending disposition of the entire case. Aleknagik Natives Ltd. v. Andrus, 648 F.2d 496 (9th Cir.1980). In the course of that opinion, we reached preliminary conclusions that the district court did not adopt after considering arguments by all of the parties below. We now agree with the district court's analysis, which it reached after a full hearing and careful consideration of the consequences of the Secretary's interpretation with respect to individual occupants, municipal corporations, and village corporations, including the effect of dividing surface and subsurface rights. Aleknagik Natives, Ltd. v. United States, 635 F.Supp. 1477 (D. Alaska 1985). We adopt the well-reasoned and extensive opinion of the district court as to all of the issues raised on this appeal, and set forth here a summary of those issues and of our conclusions.
 
 
 8
 Appellants contend that the Secretary's position was incorrect. They argue that only townsite land which had reached the subdivisional step should fall within the existing rights exception. We reject that argument and uphold the Secretary's interpretation, as did the district court.
 
 
 9
 We rule at the outset that we owe the Secretary's interpretation considerable deference. Kunaknana v. Clark, 742 F.2d 1145, 1150 (9th Cir.1984); Jones v. Giles, 741 F.2d 245, 249 (9th Cir.1984). His interpretation was reasonable.
 
 
 10
 In their challenge to the Secretary's interpretation, appellants point out that at the time of segregation, municipalities are not certain to receive any land. A municipality's receipt of any parcel is contingent upon both completion of a subdivision map and an occupant's not choosing the parcel. These contingencies, appellants assert, take a municipality's interest outside the statutory phrase "valid existing rights."
 
 
 11
 We conclude that "valid existing rights" does not necessarily mean vested rights. Under the Act before its repeal, a municipality, and all individuals who had occupied specific lots within the subdivision limits, had a legitimate claim for municipal control of any unoccupied lots, control which would enhance the corporate sense of community and the powers of the municipality to control its immediate surroundings. It is rational to conclude that when the Congress repealed the law and enacted a savings clause for "existing rights," that this claim would be preserved. The term "valid existing rights" does not necessarily mean present possessory rights, or even a future interest in the property law sense of existing ownership that becomes possessory upon the expiration of earlier estates. Legitimate expectations may be recognized as valid existing rights, especially where the expectancy is created by the government in the first instance. The claim here is all the more compelling because its holder is the municipality, representing in the corporate sense the individual aspirations of separate lot occupants who were entitled to rely upon the municipality's ability to own and control unsold and unoccupied lands. A government is most responsible when it recognizes as a right that which is not strictly enforceable but which flows nevertheless from the government's own prior representations. That in essence is what the Secretary has done here. The Secretary's reading of the words "valid existing" to mean something other than "vested" is reasonable.
 
 
 12
 Appellants contend that the legislative history points to a more limited interpretation and argue that Congress intended to provide native village corporations with the central lands in the village, as well as a buffer zone of land around the village. They cite legislative reports that identify the need to "provide protection and a buffer from the intrusions of others." S.Rep. No. 925, 91st Cong., 2d Sess. 59 (1970). This buffer and protection, appellants claim, will be destroyed if non-natives are allowed to occupy these lands.
 
 
 13
 Although we agree that resort to legislative history is appropriate, we are unpersuaded by appellants' interpretation. It would have been reasonable for the Secretary to assume in 1971-72 that most individuals who would benefit from the continuation of settlement would be natives. In fact between 1971 and 1976 almost two-thirds of these deeds went to natives. Further, only through continuation of the townsite distributions could natives receive restricted deeds that would increase the likelihood that they would be able to retain their lands and eliminate any pressure to generate a profit from its sale. 43 C.F.R. Secs. 2564.4, 2564.6-2564.7 (1971). The Secretary's interpretation was reasonably consistent with the buffer zone purpose of ANCSA.
 
 
 14
 The Secretary's interpretation also had beneficial effects that are completely consistent with ANCSA's purpose of setting up a reasonable and rational land allocation system. Under appellants' proposed interpretation, all vacant, unsubdivided townsite lands would have been withdrawn as of 1971. The surface estate in these lands would then have been conveyed to the local village corporations as part of their total ANCSA entitlements. The subsurface estate, however, would have been conveyed to the corresponding regional corporations. See 43 U.S.C. Secs. 1610(a)(1), 1611(a)(1), 1613(f) (1982). Such divided ownership is not necessarily consistent with sound municipal planning.
 
 
 15
 Appellants make two other arguments, both of which can be dismissed quickly. Appellants contend that even if the Secretary's interpretation of section 11(a)(1) of ANCSA is upheld, the Secretary violated ANTA section 3, 43 U.S.C. Sec. 735 (repealed 1976), by failing to administer townsite lands exclusively for natives. Section 3 of ANTA does not, however, say "exclusively." It merely says the Secretary "is authorized to" extend the townsite laws to Indian and Eskimo villages. We need look no further than the words of the statute to reject appellants' argument on this score.
 
 
 16
 Finally, appellants argue that the Secretary violated the Administrative Procedure Act, 5 U.S.C. Sec. 553, section 25 of ANCSA, 43 U.S.C. Sec. 1624 (1982), and the Freedom of Information Act, 5 U.S.C. Sec. 552(a)(1)(D), by not publishing the interpretation of ANCSA. We think, however, that the district court properly applied our holdings in Alcaraz v. Block, 746 F.2d 593, 613 (9th Cir.1984), and Powderly v. Schweiker, 704 F.2d 1092, 1098 (9th Cir.1983), in reaching the conclusion that the memorandum was not "substantive," as that term is used in the statutes.
 
 
 17
 The judgment of the district court is AFFIRMED.