836 F.2d 1237
 TYONEK NATIVE CORP; Cook Inlet Region, Inc., Plaintiffs-Appellants,
v.
SECRETARY OF the INTERIOR, of the United States of America;
Alaska Native Claims Appeals Board, Defendants-Appellees,
and
State of Alaska, Defendant-Intervenor-Appellee.
 No. 86-3827.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 3, 1987.
Decided Jan. 15, 1988.
As Amended Feb. 22, 1988.
 
 Russell L. Winner, Anchorage, Alaska, for plaintiffs-appellants.
 Robert L. Klarquist, Washington, D.C., for defendants-appellees.
 Elizabeth J. Barry, Anchorage, Alaska, for intervenor defendant-appellee.
 James B. Gottstein, Anchorage, Alaska, for Alaska Mental Health Ass'n, amicus curiae.
 Appeal from the United States District Court for the District of Alaska.
 Before GOODWIN, SCHROEDER and FARRIS, Circuit Judges.
 PER CURIAM:
 
 
 1
 Plaintiffs Tyonek Native Corporation and Cook Inlet Region, Inc., appeal from the district court's grant of partial summary judgment to defendants, the Secretary of the Interior and the Alaska Native Claims Appeal Board. The court upheld the defendants' ruling that Tyonek, a village corporation created under the Alaska Native Claims Settlement Act, was not entitled under that Act to select lands that the state of Alaska had selected earlier pursuant to the 1956 Mental Health Act. We reverse.
 
 
 2
 Congress enacted the Alaska Mental Health Enabling Act, Pub.L. No. 84-830, 70 Stat. 709 (1956), to create resources for mental health care in the territory. The Act granted the territory the right to select up to one million acres of vacant, unappropriated and unreserved federal land within ten years of the effective date of the Act. Land so selected was to be held as a public trust.
 
 
 3
 When Alaska was admitted to the Union, the territory's authority to select lands under the Mental Health Act was "confirmed and transferred" to the new state. See Alaska Statehood Act of 1958, Pub.L. No. 85-508 Sec. 6(k), 72 Stat. 339, 343 (1958). In 1960, invoking section 202 of the Mental Health Act, the state selected 10,000 acres of land near the village of Tyonek. The Bureau of Land Management "tentatively approved" the state's selection, but this selection has not yet been patented to the state. Authority to select Mental Health lands ended in 1966.
 
 
 4
 In 1971, Congress enacted the Alaska Native Claims Settlement Act, 43 U.S.C. Secs. 1601-1629a (1982). The Settlement Act (ANCSA) compensates Alaska Natives for lands taken from them by the United States following the purchase of Alaska from Russia in 1867. In return for the extinguishment of all Native claims to Alaska lands, ANCSA granted Alaska Natives approximately one billion dollars and forty million acres of land.
 
 
 5
 Tyonek Native Corporation is a Native village corporation formed under the Settlement Act, 43 U.S.C. Sec. 1607 (1982). The village of Tyonek is on the northwest shore of Cook Inlet, across some 50 miles of water from Anchorage. Cook Inlet Region, Inc., is a Native regional corporation formed under the Settlement Act, 43 U.S.C. Sec. 1606 (1982). Its boundaries encompass the village of Tyonek. In 1974, pursuant to the Settlement Act, 43 U.S.C. Sec. 1610(a) (1982), Tyonek Native Corporation sought to select 9,800 acres of land located across the Chuitna river and near the village of Tyonek. This land was part of Tyonek hunting and fishing territory but it also was entirely within the 10,000 acres of Mental Health lands that the state had selected in 1960. The Bureau of Land Management rejected Tyonek's application in 1976 because the state's inchoate interest appeared to preclude native selection under section 1610(a).
 
 
 6
 In 1977, on behalf of the Secretary of Interior, the Alaska Native Claims Appeal Board denied Tyonek's administrative appeal. In Re Appeal of Tyonek Native Corp., No. VLS 76-12 (ANCAB Jan. 10, 1977). Tyonek sought review in the United States District Court for the District of Columbia. The case was then transferred to the District of Alaska, and the State of Alaska intervened as a defendant. In 1986, on cross-motions for partial summary judgment, the district court ruled that the 9,800 acres were unavailable for Native selection because (1) they are not "public lands" within the meaning of section 1610(a)(1), and (2) they are not lands "selected by, or tentatively approved to, but not yet patented to, the State under the Alaska Statehood Act" within the meaning of section 1610(a)(2). Tyonek Native Corp. v. Secretary of Interior, 629 F.Supp. 554, 558 (D. Alaska 1986). The district court entered judgment in favor of the defendants pursuant to Fed.R.Civ.P. 54(b).
 
 
 7
 Tyonek on appeal argues that the 9,800 acres it seeks were "selected by, or tentatively approved to, but not yet patented to, the state under the Alaska Statehood Act," and is therefore available for Native selection under section 1610(a)(2).
 
 
 8
 This case presents two conflicting canons of statutory construction. On one hand, statutes benefiting Native Americans should be construed liberally in their favor. See Three Affiliated Tribes of the Fort Berthold Reservation v. Wold Eng'g, 467 U.S. 138, 149, 104 S.Ct. 2267, 2274, 81 L.Ed.2d 113 (1984). On the other hand, we owe considerable deference to the interpretation of the Settlement Act by the Secretary of the Interior. See Doyon, Ltd. v. Bristol Bay Native Corp., 569 F.2d 491, 496 (9th Cir.), cert. denied, 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1978); see also Monet v. INS, 791 F.2d 752, 753 (9th Cir.1986).
 
 
 9
 Because we find that the agency's interpretation is contrary to the language of the applicable statutes, we need not determine the appropriate balance between these conflicting canons. See Fagner v. Heckler, 779 F.2d 541, 543 (9th Cir.1985) (observing that we need not "defer to an agency's interpretation when there are compelling indications that the agency's interpretation is wrong").
 
 
 10
 In considering the administrative construction of statutes which an agency administers, we first must determine whether "Congress has directly spoken to the precise question at issue." Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). "If the intent of Congress is clear," we must give effect to that intent. Id. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Id. at 843. Our analysis thus begins with the language of the applicable statutes. United States v. Taylor, 802 F.2d 1108, 1113 (9th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987).
 
 
 11
 Section 1611(a) of the Settlement Act authorizes Native village corporations to select certain lands located in the vicinity of their villages. 43 U.S.C. Sec. 1611(a) (1982). Section 1610(a)(2) makes available for Native selection "[a]ll lands ... selected by, or tentatively approved to, but not yet patented to, the state under the Alaska Statehood Act."[1] 43 U.S.C. Sec. 1610(a)(2) (1982). Under the Statehood Act, the state may acquire land through a three-step approval process: first, the state must select a tract of land; second, the Secretary of the Interior must give tentative approval to the selection; and third, the state must obtain a patent from the Secretary. Alaska Statehood Act of 1958, Pub.L. No. 85-508, Sec. 6(g), 72 Stat. 339, 341-42 (1958). Because the state never obtained a patent to the land after obtaining tentative approval, the selection of the land by Tyonek must be approved if section 1610(a)(2) applies to Mental Health Act lands.
 
 
 12
 The Secretary held--and the district court agreed--that Mental Health Act lands are not covered by section 1610(a)(2) because the lands were not selected "under the Alaska Statehood Act." Tyonek v. Secretary, 629 F.Supp. at 559.
 
 
 13
 The district court read the phrase "under the Alaska Statehood Act" too narrowly. Section 1610(a)(2) applies to "[a]ll lands ... that have been selected by, or tentatively approved to, but not yet patented to, the state under the Alaska Statehood Act." 43 U.S.C. Sec. 1610(a)(2) (1982). The phrase "under the Alaska Statehood Act" modifies the three-step process for land selection set forth by section 6(g) of the Statehood Act, not solely the authority under which the lands were selected. We therefore reject the contention urged by appellees and by the dissent that Congress intended Sec. 1610(a)(2) to exclude lands that were initially granted to the territory of Alaska. If Congress had intended such an exclusion, it could have so stated. Apart from policy views, we may not parse this statute so as to find that the phrase "under the Alaska Statehood Act" applies to the authority for selection but not to the requirements of tentative approval and patenting.
 
 
 14
 Even if we were to accept the argument that section 1610(a) applies only to lands selected "under the Alaska Statehood Act," we would still find that the lands at issue here were selected by the state under the Statehood Act. The Mental Health Act of 1956 granted the territory of Alaska the right to select Mental Health Act lands. See Alaska Mental Health Act, Sec. 372(a), 70 Stat. at 711-12. In 1958, the Statehood Act expressly "confirmed and transferred" to the state of Alaska all grants previously made to the territory. See Alaska Statehood Act, Sec. 6(k), 72 Stat. at 343. Because the state of Alaska was authorized to make its initial selection in 1960 of the lands disputed here only because the Statehood Act confirmed that power, we find that these lands were selected by the state under the Statehood Act.[2]
 
 
 15
 Appellees' argument that the tract at issue was not selected under the Statehood Act because the initial unused power to select had been created before statehood by the Mental Health Act thus misses the point. The territory never exercised the power. The state's selection of the tract in question, after statehood, was possible only because the Statehood Act incorporated the rights created under the Mental Health Act. Indeed, the state has recognized implicitly that the Statehood Act rather than the Mental Health Act now provides authorization for the acquisition of Mental Health Act lands; the state sought to acquire the lands at issue here through the three-step process set forth by section 6(g) of the Statehood Act, not the two-step process set forth by section 202(a) of the Mental Health Act, which provides for selection and patent but not for tentative approval.
 
 
 16
 Appellees argue that Mental Health Act lands should be treated differently than lands selected under other provisions of the Statehood Act because the state's authorization to select new Mental Health Act lands expired in 1966 and the state thus will be unable to replace lands selected by Tyonek.[3] However, we must assume that Congress, when it enacted the Settlement Act, was aware that the state no longer could obtain new Mental Health Act lands and that it knew that the Mental Health Act grant was valid only under the Statehood Act. If Congress had intended to exclude inchoate Mental Health Act lands from native selection, it thus would have done so expressly.[4] In the absence of any indication that Congress intended such a distinction,[5] neither we nor the Secretary may interpret the statute in the manner urged by appellees regardless of policy concerns that might suggest such an interpretation.
 
 
 17
 We hold that the state selected the Mental Health Act lands at issue here under the Statehood Act and that such lands are therefore subject to section 1610(a)(2) of the Settlement Act. Because the Secretary's decision was contrary to the clear language of the applicable statutes, the holding of the district court affirming the Secretary's interpretation of the statute is reversed.
 
 FARRIS, Circuit Judge (dissenting):
 
 18
 The majority avoids the most difficult issue in this case by disingenuously discovering statutory clarity where in reality none exists. Congress did not expressly address the status of Mental Health Enabling Act land grants under the Statehood Act when it passed ANCSA, the Alaska Native Claims Settlement Act, 43 U.S.C. Secs. 1601-1629a (1982), in 1971. Nor does a study of the legislative history yield a definitive answer as to the precise meaning of the phrase "under the Alaska Statehood Act" in 43 U.S.C. Sec. 1610(a)(2). In such cases of statutory ambiguity, we are bound to accord substantial deference to reasonable interpretations by the administrator in charge of a program. The difficulty in this case arises because of a conflict between this canon of deference to the administrator and the canon of liberal construction of statutes benefiting Native Americans. Because the Secretary and the district court interpreted the phrase reasonably, and the canon requiring deference to the Secretary in cases raising interpretive issues with respect to ANCSA is controlling under the previous decisions of this Circuit, I dissent.
 
 A. The Statutory Language
 
 19
 The majority argues that section 1610(a)(2) reflects a clear congressional intention to withdraw for Native selection lands previously entrusted to Alaska to care for the mentally ill. This argument depends in turn on the Mental Health Act lands having been totally subsumed in the Alaska Statehood Act. Under the majority's reading, the clause in the Statehood Act that "confirmed and transferred" prior land grants from the Territory of Alaska to the State of Alaska, see Alaska Statehood Act of 1958, Pub.L. No. 85-508 Sec. 6(k), 72 Stat. 339, 343 (1958), must have transformed the identity of Mental Health Act grants into grants made under the Statehood Act.
 
 
 20
 This reading of the phrase "under the Alaska Statehood Act" in section 1610(a)(2) by no means represents, as the majority contends, "the clear language of the applicable statutes." To the contrary, a straightforward reading of both ANCSA and the Statehood Act leads to the conclusion that the most reasonable interpretation of the phrase "under the Alaska Statehood Act" is that Congress intended it to refer only to those lands that were originally granted to Alaska under the Statehood Act. Section 6(k) of the Statehood Act, rather than transforming the essence of the Mental Health Act grants, did no more than confirm the continued vitality of the grants after the admission of Alaska into the Union. As the district court reasoned:
 
 
 21
 [B]y its terms, section 6(k) merely confirms and transfers Territorial grants to the state upon its admission. It does not purport to transform the MHEA land grant into a grant under the Statehood Act. It only vests the state with the authority to execute the powers and responsibilities conferred to the Territory by the MHEA.
 
 
 22
 Tyonek Native Corp. v. Secretary of the Interior of the United States, 629 F.Supp. 554, 559 (D. Alaska 1986). Under the majority's tortured reading of section 6(k), a forthright provision inserted for the purpose of officially recognizing Alaska's status as a State rather than a Territory is transmogrified into a veiled attempt to swallow up and, in effect, to nullify earlier legislation.
 
 
 23
 The majority's reading, in addition to straining the concise and direct wording of section 6(k), clashes with other parts of the Statehood Act. Section 6(g), in creating the format under which the State was to select "all lands granted in quantity to an authorized to be selected ... by this Act," implicitly distinguished between prior grants, which the Statehood Act merely confirmed, and original grants made under the Statehood Act. Likewise, section 6(i), which provided for mineral land grants, explicitly referred to "[a]ll grants made or confirmed under this Act," thereby acknowledging Congress's understanding that pre-statehood grants, far from being subsumed in the grants made under the Statehood Act, stood on a separate legal footing. The Executive Branch also expressed this understanding, for in the regulations promulgated shortly after the passage of the Statehood Act, the Mental Health Act was cited as authority for Alaska's selection of mental health lands. 43 C.F.R. 76.7 (1963 ed.); 43 C.F.R. 2222.9-3 (1966 ed.).
 
 
 24
 The view that the Mental Health Act survived after Alaska became a State is also supported by ANCSA. The district court found that Tyonek's proposed construction of the phrase "under the Alaska Statehood Act" rendered this language superfluous. In seeking to find meaning for the phrase, the majority here suggests that it "modifies the three-step process for land selection set forth by Section 6(g) of the Statehood Act, not solely the authority under which the lands were selected." Stated another way, the majority's point is that the reference in section 1610(a)(2) to the Statehood Act is really a shorthand reference to the three-step process and is not intended to place any limits on the lands that the Natives may select. Thus, under the majority's view, all lands selected by the State and tentatively approved by the Secretary of the Interior but not yet patented are withdrawn for Native selection.
 
 
 25
 The foremost problem with this argument is the majority's failure to explain why Congress, if it meant the phrase "under the Alaska Statehood Act" to mean the three-step process set forth in section 6(g) of the Statehood Act, did not refer to that section explicitly. In several other parts of ANCSA, Congress did exactly that. See 43 U.S.C. Sec. 1603(a) (referring to "tentative approvals pursuant to section 6(g) of the Alaska Statehood Act"); 43 U.S.C. Sec. 1608(b) (referring "to conditional leases and sales of minerals heretofore or hereafter made pursuant to section 6(g) of the Alaska Statehood Act," and "to mineral leases of the United States that are or may be subsumed by the State under section 6(h) of the Alaska Statehood Act"); 43 U.S.C. Sec. 1609(b) (referring to "the State's right of land selection pursuant to section 6 of the Alaska Statehood Act"). When Congress referred generally in ANCSA to the Alaska Statehood Act and not to any specific provision therein, it did so to identify the general statutory authority underlying a land grant. See 43 U.S.C. Sec. 1608(c) (identifying "patent[s] hereafter issued to the State under the Alaska Statehood Act"). Similarly, the most reasonable interpretation of the phrase "under the Alaska Statehood Act" in section 1610(a)(2) is that Congress was referring to the general statutory authority for the selection of lands by the State, not to the three-part process elucidated in only a single sentence in a subsection of the Statehood Act. Such a general reference to the Statehood Act easily and directly differentiated between selection of lands under the Statehood Act and selection under other statutes, such as the Mental Health Act.
 
 
 26
 Still another problem underlying the majority's position is its failure satisfactorily to explain real differences between Mental Health Act lands and lands granted under sections 6(a) and 6(b) of the Statehood Act. Sections 6(a) and 6(b) provided that the State could replace any lands selected or tentatively approved under those two subsections by further selections. Because the period for selecting such replacement lands was twenty-five years,[1] Congress must have known in 1971 that any lands that it withdrew for Native selection could be replaced by the State. By contrast, any lands that the Natives selected under the Mental Health Act could not be replaced because the deadline for selecting such lands had long since passed.
 
 
 27
 Tyonek argues that this distinction is not material here because by 1971, the State had overselected mental health lands by some 100,000 acres. Consequently, Tyonek maintains, Congress could have permitted Native selection of up to 100,000 acres of mental health lands without forcing the State to forfeit its entitlement to one million acres. There are two difficulties with this position. First, on a purely empirical level, Congress could not have known the full extent of this "overselection" when it passed section 11(a)(2) in 1971.[2] Second, and even more seriously, Tyonek contradicts itself when it claims that Congress intended to allow Native selection of up to 100,000 acres of mental health lands because its broader argument places no such restrictions on Native selection. Specifically, Tyonek's argument that the phrase "under the Alaska Statehood Act" subsumed all mental health lands implies that all mental health lands that had been selected and approved but not yet patented to the State were available for Native selection. Tyonek cannot have it both ways. In any case, it is unreasonable to infer that the majority's position describes the plain intent of Congress when this position is itself internally inconsistent.
 
 B. Legislative History
 
 28
 Similarly unhelpful to Tyonek's case is the legislative history, which the majority itself concedes is "sparse and inconclusive." Both sides can find support for their readings of the statute in 1971 floor statements that referred to the size of the land grant under consideration. At no time during the 1971 floor discussion, however, did any legislator address the Mental Health lands. Such a discussion took place for the first time nine years later, at which time Senators Stevens and Jackson made the statements upon which the majority relies. But even then, the two senators were not specifically addressing the meaning of the phrase "under the Alaska Statehood Act" in section 11(a)(2). Moreover, just before their exchange, both senators indicated that they did not intend the amendment under consideration "to affect in any way pending litigation regarding the selectability under ANCSA of any particular tract of land including lands previously reserved to or selected by the Territory or State of Alaska under any provisions of Federal law." 126 Cong.Rec. 21,884 (1980) (statement of Sen. Jackson). The district court was surely correct in inferring that the senators are unlikely to have intended their exchange on the Senate floor to resolve this litigation, which was pending at the time, when they did not intend the amendment itself to resolve any pending litigation.
 
 C. Canons of Interpretation
 
 29
 The majority acknowledges that "[t]his case presents two conflicting canons of statutory construction," but then avoids resolving the issue of which canon should control by portraying the language of the statutes as clear and unequivocal. Because my analysis has uncovered not clarity, but rather, inconclusiveness and ambiguity in both the statutory language and the legislative history, I believe that the canon issue should be addressed.
 
 
 30
 Were this not a case involving Native Americans, there would be no question of where judicial deference should lie. This is precisely the type of case in which we are instructed to accord "great deference" to agency interpretations of a statute and to uphold them "so long as they are reasonable." Kunaknana v. Clark, 742 F.2d 1145, 1150 (9th Cir.1984); see Aleknagik Natives Limited v. United States, 806 F.2d 924, 926-27 (9th Cir.1986); Western Pioneer, Inc. v. United States, 709 F.2d 1331, 1335 (9th Cir.1983); United States v. Boyden, 696 F.2d 685, 688 (9th Cir.1983). When a statute is "silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted); Western Medical Enterprises, Inc. v. Heckler, 783 F.2d 1376, 1380 (9th Cir.1986). "Regardless of whether it is the only or the better interpretation, a reasonable interpretation must be upheld." Cook Inlet Native Ass'n v. Bowen, 810 F.2d 1471, 1473 (9th Cir.1987) (emphasis added).
 
 
 31
 The potential conflict to which the majority alludes, however, arises from the liberal construction that courts customarily apply to statutes benefiting Native Americans. This principle generally applies to "doubtful expressions" in statutes designed to benefit "dependent Indian tribes." Three Affiliated Tribes v. Wold Engineering, 467 U.S. 138, 149, 104 S.Ct. 2267, 2275, 81 L.Ed.2d 113 (1983).
 
 
 32
 In construing ANCSA, however, this court has concluded that this canon of liberal construction should not apply. In United States v. Atlantic Richfield Co., 612 F.2d 1132, 1138-39 (9th Cir.), cert. denied, 449 U.S. 888, 101 S.Ct. 244, 66 L.Ed.2d 113 (1980), we found that ANCSA represented an exception to the general trust relationship between the federal government and Native tribes. After noting "that in cases of ambiguity statutes are to be construed ... in favor of Indians," 612 F.2d at 1138-39, we stated:
 
 
 33
 The rule of construction of ambiguous statutes in favor of Indians is based on a concern that the powerful not take advantage of the helpless and uneducated. A similar concern guides modern law on the construction of contracts of adhesion. Where, as here, the [Natives] were represented by such illustrious counsel as former Supreme Court Justice Arthur Goldberg and former Attorney General Ramsey Clark, we think the rule of construction operates with less force.
 
 
 34
 Id. at 1139. See also Cape Fox Corp. v. United States, 4 Cl.Ct. 223, 233-34 (1983) (concluding that Congress intentionally avoided a trustee-beneficiary relationship between the federal government and the Alaska Natives when it enacted ANCSA).
 
 CONCLUSION
 
 35
 Unlike the majority, I cannot discern a clear statutory basis for its decision to overturn the reasoned interpretation of the Secretary of the Interior. Congress, in my opinion, did not speak directly to the issue at bar, and we are confronted with a vast array of conflicting evidence and interpretations. In disputes of this nature, we are required to employ accepted canons of statutory interpretation. Because the canon favoring deference to the administrator with expertise in this area is the stronger and more persuasive in the case of ANCSA, I would affirm.
 
 
 
 [1]
 Section 1610(a) provides that:
 (1) The following public lands are withdrawn, subject to valid existing rights, from all forms of appropriation under the public land laws, ... and from selection under the Alaska Statehood Act, as amended:
 (A) The lands in each township that encloses all or part of [a] Native village ...;
 (B) The lands in each township that is contiguous to or corners on the township that encloses all or part of such Native village; and
 (C) The lands in each township that is contiguous to or corners on a township containing lands withdrawn by paragraph (B) of this subsection....
 (2) All lands located within the townships described in subsection (a)(1) hereof that have been selected by, or tentatively approved to, but not yet patented to, the State under the Alaska Statehood Act are withdrawn, subject to valid existing rights, from all forms of appropriation under the public land laws ...
 43 U.S.C. Sec. 1610(a) (1982).
 
 
 [2]
 The Statehood Act did not expressly repeal the Mental Health Act, perhaps because Congress saw no need to preclude further selections by a territory that no longer existed. However, the compilers of the United States Code recognized that Alaska's admission as a state rendered the Mental Health Act provisions superfluous and omitted them from all editions of the United States Code published subsequent to statehood. See 48 U.S.C. at 9038 (1964) (explaining the omission from the code of 48 U.S.C. Sec. 46-3, Sec. 202 of the Mental Health Act)
 
 
 [3]
 Appellees also argue that our interpretation of section 1610(a)(2) results in an implied partial repeal of the grant of Mental Health Act lands. Because we find that the phrase "under the Alaska Statehood Act" expressly includes lands that had been granted to the territory under the Mental Health Act, we reject this argument
 
 
 [4]
 Where Congress intended to exclude lands from section 1610, it did so explicitly. Lands in the National Park System, lands used for national defense purposes, and lands patented to the State or to third parties were all exempted from Native selection. 43 U.S.C. Secs. 1610(a)(1), 1613(g) (1982)
 
 
 [5]
 Although the legislative history is sparse and inconclusive, it tends to support our interpretation of the statute. A basic goal of the Act was to allow natives to select lands near their villages. See Aleknagik Natives Ltd. v. Andrus, 648 F.2d 496, 503 (9th Cir.1980). In the 1971 debates over the proposed Settlement Act, two congressmen stated that 104.5 million acres of land would be subject to the Act, apparently including the Mental Health Act lands in that figure. See 117 Cong.Rec. 36851 (1971) (statement of Rep. Aspinall); id. at 36857 (statement of Rep. Haley). But at other points the numbers indicate that Congress was debating the fate only of the 103.3 million acres that Alaska was entitled to select under the substantive provisions of the Statehood Act. See House Rep. No. 523, 92d Cong., 1st Sess. 1, 4-5, 8, reprinted in 1971 U.S.Code Cong. & Admin.News 2192, 2194. In the 1980 debates over the amendment of the Act, two senators stated that mental health grants are subject to the same protection and status as any lands conveyed under the Alaska Statehood Act. See 126 Cong.Rec. 21,884 (1980) (statement of Sen. Stevens); id. (statement of Sen. Jackson). The legislative history does nothing to convince us that the Secretary's interpretation of the Act was correct when the clear language of the statute opposes his interpretation. See Consumer Prod. Safety Comm'n v. GTE Sylvania, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) (observing that "[a]bsent a clearly expressed legislative intention to the contrary, [the] language [of the statute] must ordinarily be regarded as conclusive")
 
 
 [1]
 In 1980, Congress extended the deadline for the State to make its general selections under sections 6(a) and 6(b) to January, 1994. Alaska National Interest Lands Conservation Act Sec. 906(a), Pub.L. 96-487, 94 Stat. 2371, 2437 (1980)
 
 
 [2]
 Although Bureau of Land Management records could have indicated the overselection in 1971, they did not. Not until 1974 did the Bureau prepare a memorandum estimating the overselection at more than 100,000 acres