**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

KEN MCMASTER; MAUREEN E.
GALITZ; STEVEN E. FAWL,
         *Plaintiffs-Appellants*,

         v.

UNITED STATES OF AMERICA;
BUREAU OF LAND MANAGEMENT;
UNITED STATES FOREST SERVICE;
KENNETH LEE SALAZAR,
         *Defendants-Appellees*.

No. 11-17489

D.C. No.
2:10-cv-00881-
GEB-EFB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, Senior District Judge, Presiding

Argued and Submitted
June 14, 2013—San Francisco, California

Filed September 24, 2013

Before: A. Wallace Tashima and Jay S. Bybee, Circuit
Judges, and Kimba M. Wood, Senior District Judge.[*]

Opinion by Judge Bybee

---

[*] The Honorable Kimba M. Wood, Senior District Judge for the U.S.
District Court for the Southern District of New York, sitting by
designation.

## SUMMARY[**]

### Quiet Title Act

The panel affirmed the district court's Fed. R. Civ. P. 12(b)(6) dismissal of the claims of the owner of the Oro Grande mining claim, located in the Trinity Alps Wilderness area in California, in the claim holder's action against the United States seeking to quiet fee-simple title to the mining claim and its improvements.

The panel held that the Quiet Title Act was the exclusive means for the claim holder to bring suit, and therefore the district court properly dismissed the Administrative Procedure Act and Declaratory Judgment Act claims. Regarding the claim holder's Quiet Title Act claims, the panel held that the Solicitor of the Department of the Interior's Opinion, which included an interpretation of the Wilderness Act that was contrary to the claim holder's interpretation, was entitled to at least *Skidmore* deference, and, thus, the claim holder did not have a "valid existing right" to a fee-simple patent when he filed his patent application. In addition, the panel held that the claim holder's second Quiet Title Act claim failed because the claim holder failed to plead with particularity the circumstances under which title to the improvements was acquired.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Steven J. Lechner (argued), Mountain States Legal Foundation, Lakewood, Colorado; James S. Burling and Joshua P. Thompson, Pacific Legal Foundation, Sacramento, California, for Plaintiff-Appellants.

Robert G. Dreher, Acting Assistant Attorney General; Mark Haag and Katherine J. Barton (argued), United States Department of Justice, Environment & Natural Resources Division, Appellate Section, Washington, D.C., for Defendants-Appellees.

**OPINION**

BYBEE, Circuit Judge:

McMaster owns the Oro Grande mining claim, located in the Trinity Alps Wilderness area. In 1992, McMaster filed an application for a patent, having satisfied all of the requirements for receiving a patent under the General Mining Law of 1872. However, the Bureau of Land Management ("BLM") granted McMaster a patent to only the mineral estate; the surface estate was reserved to the United States. McMaster brought suit under the Quiet Title Act ("QTA"), Administrative Procedure Act ("APA"), and Declaratory Judgment Act ("DJA"), seeking to quiet fee-simple title to the Oro Grande mining claim and its improvements. The district court dismissed all of McMaster's claims under Federal Rule of Civil Procedure 12(b)(6).

We affirm the district court's decision. We agree that the QTA is the exclusive means for McMaster to bring suit, and

thus hold that the district court properly dismissed McMaster's APA and DJA claims. With regard to McMaster's QTA claims, we hold that McMaster did not have a "valid existing right" to a fee-simple patent when he filed his patent application, and that McMaster failed to plead with particularity the circumstances under which title to the improvements was acquired.

## I.    FACTS AND PROCEDURAL HISTORY

Ken McMaster, Maureen E. Galitz, and Steven E. Fawl (collectively referred to as "McMaster") own the Oro Grande mining claim. The Oro Grande "is an approximate[ly] 20-acre placer mining claim located approximately 45 miles northwest of Redding, California, along the South Fork Salmon River in the Trinity Alps Wilderness." The claim was originally located in 1934, pursuant to the General Mining Law of 1872.

In 1934, McMaster's predecessors-in-interest purchased the Oro Grande—formerly called the Conrad Bar placer mine—from the claim's original locator, Edwin Lynch. The Bill of Sale conveyed title to the mining claim and all improvements, including a cabin and a shed. The claim was subsequently "relocated" three times between 1934 and 1953. The current configuration of the Oro Grande mining claim was located on June 23, 1953, and the corresponding Notice of Location noted improvements made to the claim, including a cabin and a shed. After a series of intestate successions and conveyances, the Oro Grande was conveyed to McMaster on April 5, 1991. The 1991 Joint Tenancy Deed noted the cabin and shed as improvements.

McMaster actively mines the Oro Grande mining claim when conditions permit—"when the South Fork Salmon River level is low enough . . . and when access to the site is possible"—in compliance with state and federal law. There are now three structures on the Oro Grande mining claim, which are used in furtherance of mining operations: a cabin, a workshop, and an outhouse. The cabin was built in the early 1890s and is constructed of split logs and shakes. McMaster uses the workshop to process samples during the mining process and to store mining equipment during the seasons in which he is unable to mine.

On August 14, 1992, McMaster filed an application to patent the Oro Grande mining claim. On August 16, 1993, the BLM State Director for California certified that McMaster had fully complied with the requirements of the 1872 Mining Law and was entitled to the First Half Mineral Entry Final Certificate ("FHMEFC"), "confirming that mineral entry was allowed and occurred upon the date of acceptance of the purchase price." The FHMEFC was issued by the Secretary of the Interior on December 1, 1994.

On August 4, 2000, the BLM issued a mineral report for the Oro Grande mining claim, concluding, *inter alia*, "[t]hat a discovery of a valuable mineral deposit of gold was made on the Oro Grande mining claim at the time it was located in 1953." An early draft of the 2000 mineral report recommended that the Oro Grande surface estate be patented along with the mineral estate, but this recommendation was ultimately revised based on an opinion issued on May 22, 1998 by the Solicitor of the Department of the Interior. *See* Solicitor's Opinion M-36994, Patenting of Mining Claims and Mill Sites in Wilderness Areas (May 22, 1998) ("Solicitor's Opinion"). A second mineral report for the Oro

Grande mining claim was issued on April 10, 2006, and likewise concluded that there was a discovery of a valuable mineral deposit and relied on the Solicitor's Opinion to recommend that only the mineral estate be patented.

On October 3, 2008, the BLM issued a patent for the Oro Grande mining claim. That patent was later cancelled to correct an error, and a new patent issued on February 10, 2009. The patent conveyed only "the mineral deposits within [the] association placer mining claim known as the Oro Grande Mining Claim," reserving "[a]ll title in or to the surface estate and products thereof" and "[a] right-of-way thereon for ditches or canals constructed by the authority of the United States" to the United States. Since the patent issued, the United States Forest Service has asserted that McMaster "do[es] not own the structures located on the Oro Grande mining claim."

On April 13, 2010, McMaster filed a complaint in federal district court under the Quiet Title Act, 28 U.S.C. § 2409a, to quiet title to fee-simple ownership of the longstanding mining structures and improvements located on the Oro Grande mining claim. McMaster also brought a claim under the APA for judicial review of the BLM's action of issuing a patent conveying only the mineral estate. On June 30, 2010, the Government filed a motion to dismiss McMaster's complaint under Federal Rule of Civil Procedure 12(b)(6). The district court granted the government's motion, holding (1) that the QTA is the exclusive means for challenging the United States' title to real property, (2) that under the QTA, McMaster "did not acquire any right to a patent until [he] filed the[] patent application," at which time McMaster was entitled to title to only the mineral estate, and (3) that under the QTA, McMaster failed to "allege[] with particularity

when and how [he] obtained ownership to the structures at issue." McMaster was granted leave to amend his complaint.

On September 24, 2010, McMaster filed his First Amended Complaint, which added new claims under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02. The government again filed a motion to dismiss the amended complaint under Rule 12(b)(6), which the district court granted, dismissing McMaster's complaint with prejudice. The district court concluded that it was barred from reconsidering McMaster's APA claims by the law-of-the-case doctrine. It also dismissed McMaster's new DJA claims because it concluded that the QTA is the exclusive means for challenging the United States' interest in real property. Regarding McMaster's QTA claims, the district court concluded that McMaster had failed to remedy the problems that the court had identified in its prior dismissal order. McMaster timely appealed.

## II.    LEGAL BACKGROUND

### A.  *Statutory History*

The General Mining Law of 1872 ("Mining Law"), 30 U.S.C. § 22 *et seq.*, was enacted to permit citizens to enter and explore unappropriated federal lands in search of "valuable mineral deposits," *id.* § 22. Citizens who discovered mineral deposits could then secure exclusive rights to the land by meeting certain statutory requirements. *Id.*; *see Independence Min. Co., Inc. v. Babbitt*, 105 F.3d 502, 506 (9th Cir. 1997). First, a claimant could validate his claim by meeting the legal requirements for "locating" and discovering the claim. *See* 30 U.S.C. § 28; *see also Cole v. Ralph*, 252 U.S. 286, 294–96 (1920). The holder of a valid,

located claim is entitled to the "exclusive right of possession and enjoyment of all the surface included within the . . . location[]," as long as he continues to meet certain requirements. 30 U.S.C. § 26; *see id.* § 28; *see also Best v. Humboldt Placer Min. Co.*, 371 U.S. 334, 335–36 (1963). This possessory interest entitles the claim holder to "the right to extract all minerals from the claim without paying royalties to the United States," *Independence Min. Co.*, 105 F.3d at 506, but the United States retains title to the land, *United States v. Locke*, 471 U.S. 84, 104 (1985). Second, "an individual who possesses a valid mining claim may go through an additional process to obtain a patent," by applying to the BLM, in the Department of the Interior, and meeting additional statutory requirements. *Swanson v. Babbitt*, 3 F.3d 1348, 1350 (9th Cir. 1993); *see* 30 U.S.C. §§ 29, 35; *Independence Min. Co.*, 105 F.3d at 506. Under the General Mining Law, a patent generally conveyed fee-simple title to both the surface estate and the mineral deposits. *See Independence Min. Co.*, 105 F.3d at 506; *see also Andrus v. Shell Oil Co.*, 446 U.S. 657, 658 & n.1 (1980).

In 1955, however, Congress enacted the Surface Resources and Multiple Use Act, 30 U.S.C. § 601–615, which established that any unpatented claim located after the effective date of the Act could not be used "for any purposes other than prospecting, mining or processing operations and uses reasonable incident thereto," *id.* § 612(a); *see United States v. Backlund*, 689 F.3d 986, 991 (9th Cir. 2012). Claimants would no longer receive the exclusive right of possession and enjoyment of the surface prior to patenting their claim; their claims would be subject to "the right of the United States to manage and dispose" of the surface of any such mining claim. 30 U.S.C. § 612(b); *see Backlund*, 689 F.3d at 991.

Then, in 1964, Congress enacted the Wilderness Act, 16 U.S.C. §§ 1131–36, which "established the National Wilderness Preservation System [("NWPS")] to be composed of federally owned areas designated by Congress as 'wilderness areas,'" *id.* § 1131(a). The stated purpose of the Wilderness Act was to "secure for the American people of present and future generations the benefits of an enduring resource of wilderness" by creating and administering wilderness areas "for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, [and] the preservation of their wilderness character." *Id.* The Wilderness Act also represented a compromise between mining and preservation interests. *See* Kenneth D. Hubbard et. al., *The Wilderness Act's Impact on Mining Activities: Policy Versus Practice*, 76 Denv. U. L. Rev. 591, 591–92, 597 (1999). Section 1133(d)(3), in particular, was a product of this compromise, *see id.* at 591–92; it limited the creation of future mining interests, while preserving some pre-existing mining interests and providing a grace period for discoveries. *See* 16 U.S.C. § 1133(d)(3). "[S]ubject to valid existing rights," patents that issued after the effective date of the Wilderness Act, would convey title only to the mineral deposits, with the surface estate being reserved to the United States. *Id.* New claims could also be located under the Act, but only until December 31, 1983. *Id.* After December 31, 1983, no patent would issue to claims located within a wilderness area, "except for valid claims existing on or before December 31, 1983." *Id.* And "[s]ubject to valid rights then existing," beginning on January 1, 1984, "all forms of appropriation under the mining laws" would no longer apply to any lands designated as wilderness areas. *Id.*

Twenty years later, the California Wilderness Act of 1984 made the Wilderness Act applicable to the Oro Grande mining claim as of September 28, 1984. Pub. L. No. 98-425, Title I, § 101(a)(34) (1984).

B.  *Regulatory History*

In 1966, the BLM promulgated a regulation to implement § 1133(d)(3) of the Wilderness Act. *See* 43 C.F.R. § 3638.5 (1996) ("the regulation"). The regulation states that any "patent issued under the U.S. mining laws for mineral locations established after [the effective date of the Wilderness Act], or validated by discovery of minerals occurring after [the effective date of the Wilderness Act]," would convey title only to the mineral deposits and would reserve title to the surface of the land to the United States. *Id.* Although § 3638.5 does not directly address whether such a reservation of surface rights to the United States applied to unpatented claims located prior to the effective date of the Wilderness Act, in practice, the BLM regularly conveyed fee-simple patents to such claims. *See* Solicitor's Opinion at 1, 19–20. In 1981, the BLM also published a policy stating that "[a] patent conveying both surface and mineral rights *may* be issued on a valid claim located prior to the date the area was included as part of the National Wilderness Preservation System." Bureau of Land Management, Wilderness Management Policy, 46 Fed. Reg. 47,180-01 (1981) ("BLM policy") (emphasis added). And in 1991, the BLM issued a manual stating that "[f]or claims located before enactment of the Wilderness Act . . . the claims must have a discovery as of the date of enactment to acquire the surface and mineral estates," BLM Manual H-3860-1, Mineral Patent Application Processing, VIII-7 (1991) ("the Manual").

On May 22, 1998, the Solicitor of the Department of the Interior issued Opinion No. M-36994 disagreeing with BLM's practice of conveying fee-simple patents to all valid claims located before the wilderness designation. *See* Solicitor's Opinion at 20. The Solicitor's Opinion recognized the BLM's policies and practices, *see id.* at 19–20, but ultimately instructed the BLM to follow a new policy:

> [M]ineral patents issued under the Mining Law for lands within the wilderness areas . . . should convey only the mineral deposits within the claim, unless the mining claim for which the patent is sought was located and validated by a discovery prior to designation of the wilderness area *and* the claimant complied with all the requirements for obtaining a patent under the Mining Law prior to the wilderness designation, as determined by the Secretary.

*Id.* at 21. This interpretation specified that the new policy should "be applied to . . . currently pending applications." *Id.*

## III.     DISCUSSION

McMaster appeals the district court's dismissal of his QTA, APA, and DJA claims, arguing that he is entitled to fee-simple title to the surface estate of his claim. "We review *de novo* the district court's dismissal for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Stone v. Travelers Corp.*, 58 F.3d 434, 436–37 (9th Cir. 1995). We have jurisdiction pursuant to 28 U.S.C. § 1291.

### A.  *QTA Claims*

McMaster raised two independent QTA claims: (1) that the QTA required the government to convey fee-simple ownership of surface and mineral estates of the Oro Grande mining claim to McMaster; and (2) that McMaster properly holds title to all improvements and structures located on the Oro Grande mining claim. We consider each in turn.

1.  Fee-simple title to Oro Grande mining claim

In dismissing McMaster's first QTA claim, the district court held pursuant to the Wilderness Act that McMaster did not have a "'valid existing right' to a patent conveying fee-simple ownership of the surface estate and structures associated with [its] mining claim." The relevant portion of the Wilderness Act states:

> [H]ereafter, *subject to valid existing rights*, all patents issued under the mining laws of the United States affecting national forest lands designated by this chapter as wilderness areas shall convey title to the mineral deposits within the claim . . . , but *each such patent shall reserve to the United States all title in or to the surface of the lands and products thereof*, and no use of the surface of the claim or the resources therefrom not reasonably required for carrying on mining or prospecting shall be allowed except as otherwise expressly provided in this chapter: Provided, That, unless hereafter specifically authorized, no patent within wilderness areas designated by this chapter shall issue after December 31, 1983, except for the valid claims existing on or before December 31, 1983. Mining claims

located after September 3, 1964, within the boundaries of wilderness areas designated by this chapter shall create no rights in excess of those rights which may be patented under the provisions of this subsection.

16 U.S.C. § 1133(d)(3) (emphases added).

McMaster argues that in passing the Wilderness Act, Congress intended for claimants to receive fee-simple title to their pre-existing valid claims. More specifically, McMaster contends that the "valid existing rights" language of the Wilderness Act protects claimants' legitimate expectations of fee-simple title, preserving the right to the surface estate for all those who had properly located a mining claim prior to the relevant wilderness designation.

McMaster claims that the BLM's regulation, policy, and manual are consistent with its interpretation and should have been applied to McMaster's claim, and that the Solicitor's Opinion, which is contrary to McMaster's interpretation, is not entitled to any deference.

a.   BLM's regulation, Manual, and BLM policy

McMaster argues that the regulation, Manual, and BLM policy are consistent with his interpretation and require that McMaster be issued a fee-simple patent. None of these, however, clearly requires issuing title to the surface estate for all valid claims.

First, the regulation contained in 43 C.F.R. § 3638.5 states that for "mineral locations established after [the effective date of the Wilderness Act], or validated by discovery of minerals

occurring after [the effective date of the Wilderness Act],” title will issue to only the mineral deposits; the United States will retain title to the surface of the land. 43 C.F.R. § 3638.5. Section 3638.5 does not even address claims that were established prior to the effective date of the Wilderness Act. And stating that claims discovered after the effective date of the Act receive only limited patents does not necessarily mean that every valid claim located prior to the time announced in the Regulation is entitled to a fee-simple patent.

In contrast to the regulation, the Manual addresses claims that were established prior to the wilderness designation. The Manual states that “[f]or claims located before enactment of the Wilderness Act . . . the claims must have a discovery as of the date of enactment to acquire the surface and mineral estates,” BLM Manual H-3860-1, Mineral Patent Application Processing, VIII-7 (Apr 17, 1991). Although the Manual indicates that a claim must be discovered prior to the wilderness designation to receive title to the surface estate, nowhere does the manual state that this is all that is required. Indeed, discovery is a necessary, but not a sufficient, condition for establishing a valid claim; the claim must also be located “by reference to some natural object or permanent monument as will identify the claim.” 30 U.S.C. § 28; *see Cole*, 252 U.S. at 296. Moreover, even if the Manual could be read as stating that valid claims established before the wilderness designation are entitled to title to the surface state, BLM manuals are not legally binding. *See Schweiker v. Hansen*, 450 U.S. 785, 789–90 (1981) (holding that a Social Security manual did not bind the Social Security Administration because it is not a regulation and has “no legal force”); *Robert S. Glenn DeLloyd Cazier*, 124 IBLA 104, 109 (IBLA 1992) (“Instruction Memoranda and BLM Manual provisions do not have the force and effect of law and are not

binding on either this Board or the public at large." (internal quotation marks and citation omitted)).

Finally, the BLM policy states that "[a] patent conveying both surface and mineral rights *may* be issued on a valid claim located prior to the date the area was included as part of the National Wilderness Preservation System." Bureau of Land Management, Wilderness Management Policy, 46 Fed. Reg. 47,180-01 (1981) (emphasis added). Although the BLM policy indicates more clearly that valid claims may receive fee-simple title, the language of the policy is discretionary ("may be issued"). The policy thus leaves room for BLM to impose additional requirements for receiving fee-simple title. And, in any event, like the Manual, a BLM management policy is not legally binding. *See King's Meadow Ranches*, 126 IBLA 339, 341 n.2 (IBLA 1993) (stating that policies "not established by regulation . . . lack[] the force and effect of law"); *see also Schweiker*, 450 U.S. at 789–90.

Thus, neither the regulation, nor the Manual, nor the BLM policy entitles McMaster to fee-simple title to the surface estate.

### b. The Solicitor's Opinion

In contrast to McMaster's interpretation of "valid existing rights," the Solicitor's Opinion concluded that the term refers to a claimant who had actually "filed a patent application, and established a right to a patent before the land in question was designated as wilderness" by "complying with all the requirements for obtaining a patent." Solicitor's Opinion at 3, 21. Under this reading, the Wilderness Act does *not* preserve a right to a surface estate for those who "located a mining claim and made a discovery of a valuable mineral claim

deposit before the land in question was designated as wilderness, but . . . had not established a right to a patent before the land was designated as wilderness." *Id.* at 3–4. Since the Solicitor's Opinion is contrary to McMaster's interpretation of the statute, we must determine whether it is owed deference.

### i.   *Chevron* deference

Under *Chevron*, we conduct a two-step inquiry to determine whether an agency interpretation warrants deference. At step one, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "If the intent of Congress is clear, that is the end of the matter; [and we] . . . must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If, however, "the statute is silent or ambiguous," *id.* at 843, prior to step two, "we must decide how much weight to accord an agency's interpretation," *Tualatin Valley Builders Supply, Inc. v. United States*, 522 F.3d 937, 940 (9th Cir. 2008); *see United States v. Mead Corp.*, 533 U.S. 218, 227–28 (2001); *N. Cal. River Watch v. Wilcox*, 633 F.3d 766, 772–73 (9th Cir. 2010). If we determine that *Chevron* deference applies, then we move to step two, where we will defer to the agency's interpretation if it is "based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.

First, we hold that the meaning of "valid existing rights" in § 1133(d)(3) is ambiguous under *Chevron* step one. Section 1133(d)(3) clearly excepts "valid existing rights" from its mandate that patents should be issued to only the mineral estate; but what constitutes a "valid existing right[]"

is not clear from the text; the term is undefined. *See Chevron*, 467 U.S. at 842–43. The contrasting interpretations that McMaster and the government offer for "valid existing rights" demonstrate the ambiguity inherent in the term. As explained, McMaster argues that "valid existing rights" preserves the right to the surface estate for all those who had properly located a mining claim prior to the relevant wilderness designation because they had a legitimate expectation that they would receive title. In contrast, the government argues that "valid existing rights" are akin to "vested rights," and Congress retains the authority to limit and regulate a preexisting mining claimant's opportunity to obtain a patent. Courts that have interpreted the term "valid existing rights" within the context of other statutes have sometimes defined the term in accordance with the government's definition, *see, e.g.*, *Alaska Miners v. Andrus*, 662 F.2d 577, 579–80 (9th Cir. 1981) (holding that a plaintiff with valid claim did not have a "valid existing right" to a patent "prior to the payment of any money for the granting of the patent for the land"); *Freese v. United States*, 639 F.2d 754, 758 (Ct. Cl. 1981) (holding that claimant who was denied a patent had his "valid existing rights" preserved and that "[t]he law is well-settled that [a] vested right [to a] patent does not arise until there has been full compliance with the extensive procedures . . . for the obtaining of a patent"). Other times courts have arguably interpreted the term in a manner consistent with McMaster's definition, *see, e.g.*, *Aleknagik Natives Ltd. v. United States*, 806 F.2d 924, 926–27 (9th Cir. 1986) (holding that "'valid existing rights' does not necessarily mean vested rights[;] . . . legitimate expectations may be recognized as valid existing rights, especially where the expectancy is created by the government in the first instance"); *Seldovia Native Ass'n, Inc. v. Lujan*, 904 F.2d 1335, 1343 (9th Cir. 1990) (applying *Aleknagik*); *cf.*

*E. Cent. Eureka Mining Co. v. Cent. Eureka Mining Co.*,
204 U.S. 266, 269–70, (1907) (holding that the phrase "rights
or interests . . . under existing laws" included "inchoate
rights").

In addition, the District of Columbia Circuit has
specifically held that the phrase "subject to valid existing
rights," as contained in a different statute, is ambiguous under
*Chevron* step one. *See Nat'l Mining Ass'n v. Kempthorne*,
512 F.3d 702, 707–08 (D.C. Cir. 2008).[1] Moreover, with
regard to the Wilderness Act in particular, the fact that the
Department of the Interior has changed its practice—and as
McMaster argues, also its written policies and regulations[2]—
with regard to what constitutes a "valid existing right" also
supports our conclusion that the term is ambiguous. *See*
Solicitor's Opinion at 19–20.

Since we conclude that the meaning of "valid existing
rights" in § 1133(d)(3) is ambiguous under *Chevron* step one,
we must determine how much weight to afford the agency
interpretation before moving to step two. *See Tualatin Valley*

---

[1] The statute at issue in *Nat'l Mining Ass'n* was the Surface Mining
Control and Reclamation Act of 1977 ("SMCRA"). The Office of Surface
Mining Reclamation and Enforcement ("OSM") has stated that "valid
existing rights" under SMCRA "is not analogous to ['valid existing
rights'] under other Federal statutes," Valid Existing Rights, 64 Fed. Reg.
70766-01 (Dec 17, 1999), including our interpretation of "valid existing"
rights in the Alaska Native Claims Settlement Act. *See Aleknagik*,
806 F.2d at 926–27. This further illustrates the ambiguity in the term.

[2] As explained, although the BLM had a practice of issuing fee-simple
patents to claimants who had located their claims prior to the wilderness
designation, *see* Solicitor's Opinion at 19–20, its written policies and
regulation were arguably not clear as to whether a fee-simple patent must
always issue to a claimant in McMaster's position.

*Builders*, 522 F.3d at 940; *see also Mead*, 533 U.S. at 227–28; *Wilcox*, 633 F.3d at 772–73. *Chevron* deference applies only when (1) "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law," and (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27.

Although it seems clear that Congress has explicitly delegated authority to the Secretary of the Interior to prescribe regulations relating to the operation of the Mining Law and the issuance of patents, *see* 30 U.S.C. § 22; 43 U.S.C. § 2,[3] the Solicitor's Opinion was not "promulgated in the exercise of [the Department's] authority" to issue regulations regarding public lands. *Mead*, 533 U.S. at 226–27. The Supreme Court has stated that "[i]nterpretations such as those in opinion letters which lack the force of law[] do not warrant *Chevron*-style deference," *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000), and we have relied on *Christensen* to broadly conclude that "Solicitor's opinions . . . cannot properly be viewed as an administrative agency interpretation of statute that has the force of law." *The*

---

[3] Congress has specified that citizens seeking to acquire title to mining claims must follow "regulations prescribed by law," 30 U.S.C. § 22, and has made clear that the "Secretary of the Interior . . . shall perform all executive duties appertaining to the . . . sale of the public lands of the United States, or in anywise respecting such public lands, and, also, such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the Government." 43 U.S.C. § 2. The Supreme Court has confirmed that these statutes make clear that "the Department [of the Interior] has been granted plenary authority over the administration of public lands, including mineral lands; and it has been given broad authority to issue regulations concerning them." *Best*, 371 U.S. at 336–37.

*Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1068 n. 16 (9th Cir. 2003), *amended on reh'g en banc by* 360 F.3d 1374 (9th Cir. 2004).[4] Thus, the Solicitor's Opinion does not warrant *Chevron* deference.

ii.   *Skidmore* deference

---

[4] *Wilderness Soc'y* declares that Solicitor's Opinions, as a class, are not entitled to *Chevron* deference because "[s]uch opinions . . . normally are the product of individual lawyers advising their client agencies . . . [and] do not . . . involve procedural protections comparable to an agency's rulemaking procedures." *Id.* at 1068 n.16. *But see Mead*, 533 U.S. at 230–31. If we were deciding the issue on a blank slate we might come out somewhat differently. The Solicitor Opinion at issue in *Wilderness Soc'y* addressed a specific project in Alaska, "d[id] not attempt to draw broader conclusions regarding the permissibility of th[e] type of enterprise [at issue]," and "was not a document intended to have the general force of law." *Id.* at 1068. In contrast, here, the Solicitor's Opinion was arguably issued with a "lawmaking pretense." *Marmolejo-Campos v. Holder*, 558 F.3d 903, 908–09 (9th Cir. 2009) (en banc). The Opinion's interpretation of "valid existing rights" applies to an entire class of claims, and the Opinion itself specifically requires the BLM to "amend its regulations . . . and its Manual . . . to comport with th[e] Opinion," and to apply the Opinion to "all new and currently pending patent applications." Solicitor's Opinion at 21–22. Moreover, Solicitor Opinions, generally, have "precedential value"—they "bind future parties." *Marmolejo-Campos*, 558 F.3d at 909. Solicitor's Opinions are binding on the Interior Board of Land Appeals ("IBLA"), an appellate body that hears appeals from BLM decisions. *See* Solicitor's Opinion M-37003, *Binding Nature of Solicitor's Opinions on the Office of Hearings and Appeals* (Jan. 18, 2001); *United States v. Rannells*, 175 IBLA 363, 377 n.3 (IBLA 2008). Indeed, it seems to be somewhat of an anomaly that we have concluded that IBLA opinions are entitled to *Chevron* deference, *see Brandt-Erichsen v. U.S. Dep't of Interior, Bureau of Land Mgmt.*, 999 F.2d 1376, 1381 (9th Cir. 1993), but Solicitor Opinions, which are binding on the IBLA and can overrule IBLA decisions are not, *see* 43 C.F.R. 4.5(a). But, since we ultimately conclude that the Solicitor's Opinion is entitled to *Skidmore* deference, the question of whether *Chevron* applies is not determinative in this case.

An agency action that does not warrant *Chevron* deference may still warrant "respect proportional to its 'power to persuade.'" *Mead*, 533 U.S. at 235 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Under *Skidmore*, "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and [any other] factors which give it power to persuade." *Skidmore*, 323 U.S. at 140.

We conclude that the Solicitor's Opinion is entitled to respect under *Skidmore*. It is a well-reasoned, formal, signed, twenty-two page opinion, *see* Solicitor's Opinion at 1–22, that is "thorough[] . . . in its consideration," and ultimately persuasive. *Skidmore*, 323 U.S. at 140.

McMaster argues that the Solicitor's opinion is inconsistent "with earlier . . . pronouncements." For the reasons explained earlier, the Solicitor's Opinion was not clearly contrary to the regulation or, arguably, the Manual, although it does appear to be in tension with the prior BLM policy (though the policy still left the agency room for discretion). To the extent there is any inconsistency, however, this is just one factor under *Skidmore*. The Solicitor's Opinion also carefully analyzes the text, purpose, and legislative history of the Wilderness Act, as well as the "modern judicial treatment of valid existing rights with respect to legislation affecting mining claims and patents." Solicitor's Opinion at 1–16. In sum, the Solicitor's Opinion is a "persuasive interpretation of the law," *Tualatin Valley Builders*, 522 F.3d

at 942, despite the fact that it arguably represents a change in the agency's view.[5]

First, the Solicitor's Opinion's reading of "valid existing rights" is consistent with the text of § 1133(d)(3). Section 1133(d)(3) states that "hereafter, subject to valid existing rights, all patents issued under the mining laws of the United States affecting national forest lands designated by this chapter as wilderness areas shall convey title to the mineral deposits within the claim." Because the phrase "subject to valid existing rights" clearly refers to the issuance of a limited patent to the mineral estate, "valid existing rights" must refer to a claimant's valid existing right *to a patent*—not merely a valid claim. *See* Solicitor's Opinion at 5 ("[T]he phrase 'valid existing rights' must refer only to a claimant's valid existing rights to a patent."). Moreover, as the Solicitor's Opinion points out, *see* Solicitor's Opinion at 6, § 1133(d)(3) references both "valid existing rights" and "valid claims." By virtue of the fact that Congress used both of these phrases in the same section of a statute, we infer that Congress intended different meanings. *SEC v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003) ("It is a well-established

---

[5] To the extent that McMaster argues that the Solicitor's Opinion is arbitrary and capricious because it represented a "reversal of agency policy" or a "change from agency practice," McMaster's argument fails. Agency inconsistency is "at most" a reason for concluding that an action is arbitrary and capricious only when the change in position is inadequately explained. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005); *cf. id.* at 981 (explaining that *Chevron* still applied to an inconsistent policy because "[a]n initial agency interpretation is not instantly carved in stone[;] . . . the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis"). Here, the change in the agency's practice was not unexplained. The Solicitor Opinion clearly, and rather extensively, stated the reasons supporting its interpretation.

canon of statutory interpretation that the use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words."). Thus, the exception of "valid existing rights" from § 1133(d)'s requirement that the surface estate be reserved to the government cannot mean that any "valid claim" is excepted from the requirement that the surface estate be reserved. "Valid existing rights" must mean something different.

The Solicitor Opinion's reading is also consistent with the purpose of the Wilderness Act. The Wilderness Act was enacted to "secure for the American people of present and future generations the benefits of an enduring resource of wilderness"  by creating and administering wilderness areas "for the use and enjoyment of the American people in such manner as will leave them unimpaired for future use and enjoyment as wilderness, and so as to provide for the protection of these areas, [and] the preservation of their wilderness character." 16 U.S.C. § 1131(a). As the Solicitor's Opinion explains, reading "valid existing rights" narrowly, so as to require more than a mere "valid claim," helps to "maximize protection of the wilderness" and is consistent with the Act's "protective thrust." Solicitor's Opinion at 7. Although, to some extent, § 1133(d)(3) also represented a compromise between mining and preservation interests, *see* Hubbard, 76 Denv. U. L. Rev. at 597, construing "valid existing rights" in this manner does not interfere with mining interests. A fee-simple patent is not necessary for mining to continue. *See Independence Min. Co*, 105 F.3d at 509 (stating that a miner "need not obtain patents to continue its mining operation"). The holder of a valid, located claim is entitled to the "exclusive right of possession and enjoyment of all the surface included within the . . . location[]," 30 U.S.C. § 26;

*see id.* § 28; *see also Best*, 371 U.S. at 335, and has "the right to extract all minerals from the claim without paying royalties to the United States," *Independence Min. Co.*, 105 F.3d at 506 (internal citation omitted).

In addition to being consistent with the text and purpose of the Wilderness Act, the Solicitor's Opinion is also in harmony with precedent. For example, in *Alaska Miners v. Andrus*, claimants challenged a provision of the Alaska Native Claims Settlement Act ("ANCSA"), 43 U.S.C. § 1601 *et seq.*, which limited the issuance of patents to those with valid claims who complied with the mining laws and applied for a patent within a five year period. *See Alaska Miners*, 662 F.2d at 579–80; *see also* 43 U.S.C. § 1621(c). ANCSA provided that "[a]ll conveyances . . . shall be subject to *valid existing rights*," 43 U.S.C. § 1613(g) (emphasis added); *see also Alaska Miners*, 662 F.2d at 579–80. The claimants argued that miners with valid claims "have a valid existing right to require the government to hold open indefinitely the option to apply for a patent," *Alaska Miners*, 662 F.2d at 579, essentially the same argument McMaster makes here. We held that:

> Appellants ha[d] no such right to a patent or to the opportunity to apply for a patent outside of the time restriction [mandated by the Act]. Appellants may well have an existing right to prevent third parties from interfering with their possessory interest. However, they have no right to prevent the government from conveying the legal title to the native corporations.

*Id.* Moreover, we reasoned that "the interest of a claimant in a mining claim, *prior to the payment of any money for the granting of the patent for the land*, is nothing more than a right to the exclusive possession of the land based upon conditions subsequent, a failure to fulfill which forfeits the locator's interest in the claim." *Id.* (emphasis added).[6]

The U.S. Court of Claims has similarly held that the owner of a valid but unpatented mining claim had no right to receive a patent because he "had not yet taken the first step towards obtaining patents." *Freese*, 639 F.2d at 758. In response to the claimant's argument that "his right to the issuance of a patent upon each of his mining claims vested as soon as he completed the discovery and location of each claim," the court explained that "[t]he law is well-settled that [a] vested right [to a patent] does not arise until there has been full compliance with the extensive procedures set forth in the federal mining laws for the obtaining of a patent." *Id.*; *see also Cook v. United States*, 37 Fed. Cl. 435, 445–46 (Fed. Cl. 1997) (holding that plaintiffs were "entitle[d] to a patent" and had a vested property interest once they did "all that [was] required . . . under existing law to receive title to public

---

[6] *East Central Eureka Mining Co. v. Central Eureka Mining Co.*, 204 U.S. 266, 269–71, (1907), is not to the contrary. In *East Central*, the statutory language at issue was broader than "valid existing rights"—the savings clause referred to "rights *or interests* in mining property acquired under existing laws." *Id.* at 270. The Court also concluded that "rights" meant rights in the "popular" sense, rather than "technical[] legal sense." *Id.* at 271. In contrast, here, "valid existing rights" has been treated as a technical, legal term that has been subjected to precise interpretations by courts and agencies. *See, e.g.*, Valid Existing Rights, 64 Fed. Reg. 70766-01 (Dec 17, 1999); *Nat'l Mining Ass'n*, 512 F.3d at 707–08; *Aleknagik*, 806 F.2d at 926–27; *Alaska Miners*, 662 F.2d at 579–80; *Freese*, 639 F.2d at 758.

land, including the filing of all papers and, where applicable, the payment to the United States of the purchase price for a patent"). The court also explained that the claimant's "'valid existing rights' in his mining claims [were] . . . preserved," despite the fact that the claimant was completely denied a patent, because the claimant's "rights of use, enjoyment and disposition in his unpatented mining claims remain[ed] undiminished." *Freese*, 639 at 758.

Although we previously held in *Aleknagik*, with regard to a different statute, that it was reasonable for an agency to interpret "valid existing rights" "to mean something other than 'vested'" where plaintiffs had a "legitimate claim" and the government represented that claimants had a right to that claim, 806 F.2d at 926–27,[7] no such representation has been made to individuals in McMaster's situation. We reasoned in *Aleknagik* that "legitimate expectations may be recognized as valid existing rights, especially where the expectancy is created by the government in the first instance." *Id.* at 927. Here, however, individuals with valid claims who have not even filed a patent application do not have a "legitimate expectation" of receiving fee-simple title. They have not yet completed even the "first step" of the process of applying for a patent—in contrast to the claimants in *Aleknagik*. *Id.* at 926; *see* 30 U.S.C. § 29. Nor has McMaster claimed that the government has somehow represented to individuals with

---

[7] We applied *Aleknagik* to the ANCSA in *Seldovia Native Ass'n*, 904 F.2d at 1343. There we held that conditional purchase options granted under the Alaska Statehood Act "satisfy the requirements of a valid existing right. Because they are granted by the State of Alaska pursuant to an Act of Congress, they create legitimate expectations of property interests. In addition, they are rights leading to the acquisition of title." *Id.* *Seldovia* is also distinguishable from this case because the claimant had a legitimate expectation that was clearly created by an Act of Congress.

valid claims that they have a *right* to fee-simple title.[8] Rather, the Mining Act indicates that an individual with a valid claim will have an opportunity to apply for a patent and may receive one if he can meet the statute's requirements. *See* 30 U.S.C. § 29.

Moreover, the Supreme Court has held that "[a]lthough owners of unpatented mining claims hold fully recognized possessory interests in their claims, . . . these interests are a 'unique form of property.' The United States, as owner of the underlying fee title to the public domain, maintains broad powers over the terms and conditions upon which the public lands can be used, leased, and acquired." *Locke*, 471 U.S. at 104 (citations omitted).[9] Indeed, we held in *Swanson v. Babbitt* that "[u]ntil a patent is issued, the government has broad authority to manage public lands" and "to remove those public lands from mining claims and patents," 3 F.3d at 1352. Thus, individuals such as McMaster, who have only a valid

---

[8] By contrast, the government's conduct in *Aleknagik* suggested that the claimants—occupants of a townsite—had a right to fee-simple title. At the *Aleknagik* claimants' request, BLM had already completed a preliminary process for forming a townsite, called "segregation." 806 F.2d at 925. Here, the government has not undertaken any steps to patent the claims because McMaster has not filed the initial application. Nor has the government explicitly represented through its policies that all valid claims established before the effective date will receive fee-simple title. As explained, neither the regulation, nor the Manual, nor the BLM policy clearly require all valid claims to be patented.

[9] Contrary to McMaster's contentions, the Solicitor's interpretation is also consistent with *Stockley v. United States*, 260 U.S. 532 (1923). In *Stockley*, the Court said that "'existing valid claims' [o]bviously means something less than a vested right." *Id.* at 544. Similarly, the Solicitor interpreted "valid existing rights" to mean something more than an "existing valid claim." *See* Solicitor's Opinion at 6.

claim, do not have a legitimate expectation of receiving a patent.

Finally, the Solicitor's Opinion also addressed the legislative history to the Wilderness Act. The Opinion discusses a letter to the House of Representatives from Assistant Secretary of the Interior, John A. Carver, Jr.,which suggested adding the language "subject to valid existing rights." H. Rep. No. 88-1538 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3615. The letter explained:

> The requirement of the bill that all patents issued after the effective date of this act shall convey title to mineral deposits with a reservation to the United States of all title to the surface of the lands must be subject to 'valid existing rights." The owner of a valid mining claim perfected under the mining laws prior to the effective date of this act has already acquired a possessory title to the surface of the land and any patent issued on such a claim after the effective date of this act must convey title to both the land and mineral deposits therein, unless provision is made for just compensation.

*Id.* at 3625. Although the letter states that a patent conveying fee-simple title "must" issue to the "owner of a valid mining claim perfected under the mining laws prior to the effective date of th[e] act" because the owner has "already acquired a possessory title to the surface of the land," Carver does not provide a legal basis for this assertion. *See* Solicitor Opinion at 9–10. Carver's reference to "just compensation," however, implies that his rationale for the amendment is based, at least

in part, on avoiding compensable takings. *See* H. Rep. No. 88-1538 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3615, 3625. Viewed in that context, Carver's interpretation is an incorrect statement of the law. We have held that just compensation is required only when the claimant has a vested property right, *see Acton v. United States*, 401 F.2d 896, 899 (9th Cir. 1968), which requires more than a valid claim and a possessory interest, *see Swanson*, 3 F.3d at 1348 (holding that a "vested right does not arise until there has been full compliance with the extensive procedures set forth in the federal mining laws for the obtaining of a patent" (citation omitted)); *see also Alaska Miners*, 662 F.2d at 579–80.

In addition to the Carver letter, the Solicitor's Opinion also discusses the House Committee Report, which was apparently based on the Carver letter. Solicitor's Opinion at 8. The House Report states that § 1133(d)(3)'s limitation of surface rights would apply to "locators of claims *staked* after the effective date of the act." H. Rep. No. 88-1538 (1964), *reprinted in* 1964 U.S.C.C.A.N. 3615, 3618. (emphasis added). As the Solicitor's Opinion pointed out, this statement is somewhat inconsistent with Carver's interpretation of the savings clause—those who have merely staked a claim do not yet have a valid claim with a present possessory interest. Solicitor's Opinion at 10.

We agree with the Solicitor's Opinion that to the extent that the Carver letter or House Report implied that "owners of valid mining claims[, or staked claims,] have, without more, vested rights to a patent including the surface as well as the mineral deposits, [that] viewpoint is less persuasive," *see* Solicitor's Opinion at 9, particularly since the Carver letter and House Report are somewhat inconsistent in their interpretation of "valid existing rights." Moreover, the Carver

and House Report interpretations are also inconsistent with the text and purpose of the Wilderness Act, as well as relevant case law, as has been explained. We find the Solicitor Opinion's conclusion with regard to the legislative history convincing: The "valid existing rights" provision is "best viewed as responsive to the general constitutional concern the Assistant Secretary raised, rather than as legislating any precise understanding of the scope of those rights." *Id.* at 10. "[T]he suggestions offered in both the Carver letter and the House Committee Report . . . should not . . . be regarded as enacting into law a particular view of valid existing rights. Instead, by using such a general, common phrase, Congress was leaving it ultimately up to the courts to determine what 'valid existing rights' meant in the patenting context." *Id.*

In sum, because the Solicitor's Opinion is consistent with the text of the statute, purpose, and our prior precedent, and because it adequately discussed and explained legislative history that could be perceived contrary to its interpretation, we find the Solicitor's Opinion to be persuasive. We therefore conclude that the Solicitor Opinion's interpretation of "valid existing rights" is entitled to *Skidmore* deference.

iii.  Application

Applying the rule set forth in the Solicitor's Opinion to the facts of this case,[10] it is undisputed that as of the effective

---

[10] McMaster argues that the rule set forth in the Solicitor's Opinion has an impermissible retroactive effect as applied to its case. *See* Solicitor's Opinion at 21 (stating that the Opinion should be applied to all "currently pending patent applications"). Although "retroactivity is not favored in the law," and an agency does not have "power to promulgate retroactive rules

date of the California Wilderness Act—September 28, 1984—McMaster had nothing more than a valid claim in the Oro Grande. McMaster did not fulfill the requirements for procuring a patent until at least August 14, 1992. Therefore, McMaster did not have a "valid existing right" to a fee-simple patent under the Wilderness Act at the time that he submitted its patent application, and was properly granted a patent with reservation of the surface estates. McMaster's only "valid existing right" was to a claim, not a patent. The district court did not err in dismissing McMaster's first QTA claim under Federal Rule of Civil Procedure 12(b)(6).

> 2. Fee-simple title to mining structures and improvements on Oro Grande mining claim

McMaster argues that he properly holds title to all improvements and structures located on the Oro Grande mining claim because "[i]t is well established that mining structures incident to mining operations may be erected on valid claims," and "the mining structures [here] were constructed expressly for the benefit of the Oro Grande, and because they are . . . incident to mining the valuable mineral deposits that were granted in the limited patent, the structures are 'appurtenances' and were also granted to [McMaster]."

---

unless that power is conveyed by Congress in express terms," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), the rule set forth in the Solicitor's Opinion does not give the statute retroactive effect. The Solicitor's interpretation "does not impact [McMaster's] current possessory interest in the claims, but rather affects only its prospective interest in further property rights in the claims." *R.T. Vanderbilt Co. v. Babbitt*, 113 F.3d 1061, 1067 (9th Cir. 1997); *see Freese*, 639 F.2d at 758 ("At best," plaintiff, who had a valid claim and was denied an opportunity to apply for a patent, "suffered a denial of the opportunity to obtain greater property than that which he owned . . . .").

To invoke the QTA, a complaint must "set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and the right, title, or interest claimed by the United States." 28 U.S.C. § 2409a(d). We have not previously considered what it means to "set forth with particularity" in the context of § 2409a(d). In another context, however, this court has interpreted Federal Rule of Civil Procedure 9(b)'s requirement that fraud be pled with particularity to require "[t]he complaint [to] specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Neubronner v. Milken*, 6 F.3d 666, 671–72 (9th Cir. 1993) ("A pleading is sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." (internal quotation marks and citation omitted)).[11] We have likewise interpreted the phrase "state with particularity all facts," as contained in the Private Securities Litigation Reform Act of 1995, to mean "that a plaintiff must provide a list of all relevant circumstances in great detail." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 984 (9th Cir., 1999), *abrogated on other grounds by South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Particularity generally necessitates a great deal of specificity.

Thus, we agree with the district court that McMaster has failed to plead with particularity when and how he obtained ownership of the structures located on the former Oro Grande mining claim. McMaster's complaint states:

---

[11] Federal Rule of Civil Procedure 9(b) states, in relevant part: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

> Incident to, and in furtherance of, the mining
> operations, three structures have been erected
> on the Oro Grande mining claim: a cabin, a
> workshop, and an outhouse. The cabin was
> built in the early 1890s and is constructed
> entirely of split logs and shakes. The
> workshop is used to process samples during
> mining operations and to store mining
> equipment during seasons in which mining is
> not permitted.

McMaster also states that the Oro Grande claim was
purchased from Edwin Lynch in 1934 with a Bill of Sale that
conveyed all improvements, including a cabin and shed.
McMaster provided the documents supporting the
conveyance of the Oro Grande mining claim through time up
to 1991 when McMaster received a joint tenancy deed for the
Oro Grande mining claim noting improvements, including a
cabin and a shed.

With regard to the origins of the title to the
improvements, McMaster only generally alleges that the
structures were constructed incident to mining operations, and
specifically alleges that the cabin was built sometime in the
early 1890s. Nowhere does McMaster allege whether or how
Lynch obtained title, or whether he retained title until he sold
the Oro Grande mining claim to McMaster. These particular
facts are important because title to the structures may have
passed to the Government at some time. When a claim is
abandoned or deemed invalid, the title to surface structures
passes to the United States. *See Brothers v. United States*,
594 F.2d 740, 741 (9th Cir. 1979). Thus, McMaster has failed
to plead with particularly sufficient facts showing all of the
circumstances under which his title to the structures was

acquired, 28 U.S.C. § 2409a(d), and has failed to satisfy his burden under the QTA. *See* 28 U.S.C. § 2409a(d).

And, in any event, because McMaster no longer holds a valid claim to the Oro Grande lands, by virtue of the fact that he received only a mineral patent, he is required to obtain a special use permit prior to using the surface of the land. *See* 36 C.F.R. § 251.50. Thus, even if McMaster did "own" the structures, he would not have the right to use them, and could be required to remove them.

We conclude that McMaster's second QTA claim was properly dismissed under Federal Rule of Civil Procedure 12(b)(6).

## B. *APA Claims*

McMaster argues that the district court erred in dismissing his APA claims. McMaster's amended complaint contained three claims seeking relief under the APA. McMaster claimed: (1) that the patent reservations were not in accordance with law; (2) that the Solicitor's Opinion was not in accordance with law; and (3) that the BLM's patent reservations of the surface and remaining mineral estates, after equitable title vested, was arbitrary, capricious, and not in accordance with law.

We agree with the district court that McMaster's APA claim is essentially a challenge to the United States' title to real property and, therefore, must be dismissed because the QTA is the exclusive means for challenging the United States' title to real property.

### 1. Legal background

The Supreme Court first held in *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands* that "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property," 461 U.S. 273, 276–77 (1983). In *Block*, North Dakota brought suit against the United States to settle a dispute over ownership of certain riverbed located in the Little Missouri River. *Id.* at 277–79. Although North Dakota had asserted a number of jurisdictional bases for its claim that it was entitled to injunctive and mandamus relief—including the APA and the DJA,[12] *id.* at 278—the Court held that "North Dakota's action [could] proceed, if at all, only under the QTA." *Id.* at 292–93. The Court reasoned that "[t]he balance, completeness, and structural integrity of the [QTA] belied the contention that it was designed merely to supplement other putative judicial relief," and explained that if North Dakota were permitted to seek relief under the other statutes then "all the carefully-crafted provisions of the QTA deemed necessary for the protection of the national public interest could be averted . . . by artful pleading." *Id.* at 284–85 (internal quotation marks and citation omitted). We have followed the Supreme Court's pronouncement in *Block*, and have  similarly held that "[t]he Quiet Title Act is 'the exclusive means' by which adverse claimants can challenge the United States' title to real property," and that a claimant "cannot avoid the limitations of the Quiet Title Act" by "seeking review under the Administrative Procedure Act." *Alaska v. Babbitt*, 182 F.3d 672, 674 (9th Cir. 1999).

---

[12] North Dakota's original complaint did not mention the QTA; but the district court required it to amend its complaint to bring a QTA claim. *Id.* at 278.

The rule in *Block*, however, is not without caveat. Recently, in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, the Supreme Court held that the APA also may apply where the QTA "'is not addressed to the type of grievance which the plaintiff seeks to assert.'" 132 S. Ct. 2199, 2205 (2012) (citation omitted). The Court explained that although the QTA "provide[s] the exclusive means by which adverse claimants [can] challenge the United States' title to real property," *id.* at 2207 (internal quotation marks and citation omitted), where the suit does not involve an adverse claim to title, "then the [QTA] cannot prevent an APA suit." *Id.* at 2205. Since the plaintiff in *Patchak* did not claim ownership to the property, but rather, claimed that the government's "decision to take land into trust violates a federal statute—a garden-variety APA claim," the Court held that the APA, rather than the QTA, applied. *Id.* at 2208.

Despite this caveat, it remains clear that under both Supreme Court precedent and our precedent that the QTA provides the exclusive remedy for claims involving adverse

title disputes with the government.[13] *See Patchak*, 132 S. Ct. at 2207; *Block*, 461 U.S. at 286; *Alaska*, 182 F.3d at 674.

### 2. Analysis

Here, the "essence and bottom line," *Patchak*, 132 S. Ct. at 2207, of McMaster's APA claims is a dispute against the government over the title to the reserved surface estate of the Oro Grande mining claim.

This not a case where, for example, the government has disclaimed its title and the claims are founded on

---

[13] McMaster argues that we applied the APA to BLM decisions regarding mining claim validity in *Hoefler v. Babbitt*, 139 F.3d 726, 728–29 (9th Cir. 1998) and *Dredge Corp. v. Conn.*, 733 F.2d 704, 707 (9th Cir. 1984). Although it might be argued that the QTA should have been the exclusive means for relief in these cases because a valid mining claim has been considered an interest in real property, *see Humboldt Placer Mining Co. v. Best*, 293 F.2d 553, 555 (9th Cir. 1961) (holding that a valid mining claim is an interest in real property), *reversed on other grounds by* 371 U.S. 334 (1963); *see also United States v. Shumway*, 199 F.3d 1093, 1099–1102, 1105 (9th Cir. 1999); *Bradford v. Morrison*, 212 U.S. 389, 394–95 (1909), we need not resolve this question because this case does not involve a declaration that a mining claim was invalid.

In addition, McMaster cites a series of cases in which we applied the APA to claims to easements on public lands. These cases are inapposite. They involved challenges to the agency's decision regarding a special use permit—*i.e.*, whether the special use permit was wrongfully denied or whether the conditions on the permit were unreasonable. *See McFarland v. Kempthorne*, 545 F.3d 1106, 1110 (9th Cir. 2008); *Fitzgerald Living Trust v. United States*, 460 F.3d 1259, 1263–64 (9th Cir. 2006); *Skranak v. Castenada*, 425 F.3d 1213, 1218 (9th Cir. 2005). We did not determine title in any of these cases. *Cf. Robinson v. United States*, 586 F.3d 683, 688 (9th Cir. 2009) (concluding that "a suit that does not challenge title but instead concerns the use of land as to which title is not disputed can sound in tort or contract and not come within the scope of the QTA").

administrative wrongdoing. *See Donnelly v. United States*, 850 F.2d 1313, 1317–18 (9th Cir. 1988); *Lee v. United States*, 809 F.2d 1406, 1409 n.2 (9th Cir. 1987). As in *Block*, "the only 'administrative wrongdoing' [that McMaster claims is] the government's alleged wrongful assertion of title itself." *Donnelly*, 850 F.2d at 1318.

Since both the Supreme Court's and our precedents have held that "the QTA provides the exclusive remedy for title disputes against the government," *id.* at 1318; *see also Patchak*, 132 S. Ct. at 2207; *Block*, 461 U.S. at 286; *Alaska*, 182 F.3d at 674, McMaster's APA claims were properly dismissed under Federal Rule of Civil Procedure 12(b)(6).

## C.  *DJA Claims*

McMaster also argues that the district court erred in dismissing its three claims seeking relief under the DJA.

*Block*'s holding that the QTA is the "exclusive means by which adverse claimants c[an] challenge the United States' title to real property," *Block*, 461 U.S. at 286, also applies to DJA claims. In *Block*, the plaintiff raised a DJA claim, but the Court determined that only the QTA claims could proceed. *Id.* at 278, 292–93.

Here again, the crux of McMaster's DJA claims is that McMaster is entitled to fee-simple ownership of his Oro Grande mining claim. Thus, McMaster's DJA claims must also fail. *See Patchak*, 132 S. Ct. at 2207; *Block*, 461 U.S. at 287; *Alaska*, 182 F.3d at 674; *Donnelly*, 850 F.2d at 1318. McMaster's DJA claims were also properly dismissed under Federal Rule of Civil Procedure 12(b)(6).

# IV.  CONCLUSION

We hold that the district court did not err in dismissing McMaster's claims pursuant to Federal Rule of Civil Procedure 12(b)(6). With regard to McMaster's first QTA claim, we conclude that the Solicitor's Opinion is entitled to at least *Skidmore* deference, and, thus, McMaster did not have a "valid existing right" to a fee-simple patent on its Oro Grande mining claim. In addition, we conclude  that McMaster's second QTA claim must fail because  McMaster did not plead with particularity the circumstances under which its title to the structures was acquired. Finally, since the QTA is the exclusive means for challenging the United States' title to real property, we conclude that the district court also properly dismissed McMaster's APA and DJA claims.

**AFFIRMED.**